**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AHMAD SEIR AZATULLAH,<br><br>*Plaintiff,*<br><br>-against-<br><br>CHAD W. WOLF, Acting Secretary of the Department of Homeland Security, KENNETH T. CUCCINELLI, II, Acting Director of the United States Citizenship and Immigration Services, and LEE F. BOWES, Acting Director of the New York District of the United States Citizenship and Immigration Services,<br><br>*Defendants.* | Civil Action No. _____<br><br>**COMPLAINT** |

Plaintiff AHMAD SEIR AZATULLAH, alleges as follows, on knowledge as to himself and his own acts, and on information and belief as to all other matters:

1. Plaintiff brings this action against Defendants seeking review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, of the denial of his Form I-485 Application to Register Permanent Resident or Adjust Status, requesting an adjustment of status to permanent residence under Section 209 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1159.

**THE PARTIES**

2. Plaintiff is a native and citizen of Afghanistan. He was granted asylum in the United States in May 2001 and resides in Rockland County, New York.

3. Defendant Chad W. Wolf is the Acting Secretary of the United States Department of Homeland Security ("DHS"). He is generally charged with enforcement of the INA and is authorized to delegate such powers and authority to subordinate employees of the DHS pursuant to 8 U.S.C. § 2.1. The DHS Secretary is responsible for the determination of adjustment of status applications pursuant to § 209(b) of the INA, 8 U.S.C. § 1159, 8 C.F.R. § 209.2. The

United States Citizenship and Immigration Services ("USCIS") is an agency within the DHS to whom the Secretary's authority has in part been delegated, and is subject to the DHS Secretary's supervision. This action is brought against Mr. Wolf in his official capacity.

4. Defendant Kenneth T. Cuccinelli, II is the Acting Director of USCIS. He is generally charged with supervisory authority over all operations of USCIS and oversees the New York Office of USCIS. This action is brought against him in his official capacity.

5. Defendant Lee F. Bowes is the Acting Director of the New York Office of USCIS. He is generally charged with supervisory authority over all operations of USCIS within the New York District. Mr. Bowes's predecessor, Thomas M. Cioppa, issued the decision dated April 3, 2019 denying Plaintiff's application for adjustment of status (the "Denial") that is at issue herein. This action is brought against Mr. Bowes in his official capacity.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Plaintiff's claims under 5 U.S.C. §§ 702 and 706 (APA) and 28 U.S.C. § 1331 (federal question jurisdiction). The denial of an application for adjustment of status on the ground that the applicant is not eligible for adjustment of status or an exemption from inadmissibility is a purely legal, non-discretionary determination that is subject to judicial review. *Sepulveda v. Gonzales*, 407 F.3d 59, 62-63 (2d Cir. 2005); *Agor v. Lynch*, 276 F. Supp. 3d 7, 19 (S.D.N.Y. 2017).

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e), in that this is an action against officers and agencies of the United States in their official capacities, brought in the District where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, and where Plaintiff resides.

**EXHAUSTION OF REMEDIES**

8. There is no administrative appeal of the denial of an application for adjustment of status. Accordingly, Plaintiff has exhausted his administrative remedies.

**FACTUAL ALLEGATIONS**

9. Plaintiff was born in Kabul, Afghanistan in 1968. The Soviet Union invaded Afghanistan in 1979 and installed a totalitarian puppet government headed by Mohammad Najibullah Ahmadzai. In response, Afghan citizens formed political resistance groups that came to be known as the "mujahidin." Plaintiff's father began quietly supporting the mujahidin. He told his son that he hoped that in return, the mujahidin would offer protection from the brutal Najibullah regime.

10. The mujahidin were fully aligned with the United States in opposition to the Soviet-backed Afghan regime. The mujahidin received direct military, financial, and humanitarian support from the United States until the Soviet Union collapsed in January 1992.

11. Plaintiff began helping the mujahidin as a high school student in 1988. In early 1989, Plaintiff was detained and interrogated by his schoolteacher about suspected mujahidin activity. A few days later, he was arrested by the Afghan secret police, known as the Khad. He was held for three hours, interrogated and beaten with an electric cattle prod, but did not admit to supporting the mujahidin and was ultimately released. He never returned to school.

12. In January 1991, the Khad arrested and imprisoned Plaintiff's father and eldest brother. During the arrest, the Khad agents asked "where is the other brother?" Fearing for his safety, Plaintiff fled Kabul with his 16-year old wife, Jallah, and 12-year old brother, Hozer. With the assistance of the mujahidin, they traveled to Pakistan and then to New York.

13. Plaintiff entered the United States as a refugee on April 16, 1991. Plaintiff has had no contact or involvement whatsoever with the mujahidin since he arrived in the United States.

14. Plaintiff's father escaped from a Khad prison and by July 1991, Plaintiff's father, mother and three other brothers had all arrived in New York as refugees.

**1992 Asylum Application**

15. The eight family members filed applications for asylum in September 1991 based on a well-founded fear of persecution by the Najibullah government due to the family's support of the mujahidin.

16. At the time the applications were prepared, just months after their arrival in the United States, Plaintiff and the other applicants did not speak or understand the English language. They communicated with counsel through an uncle who had arrived in the United States a few years earlier and was not a professional interpreter. The applications and affidavits were prepared in English by counsel, based on facts translated into English by the uncle, and then read back to the applicants, translated into Farsi.

17. Question 35 on the asylum application asked "Have you taken any action that you believe will result in persecution in your home country?" Plaintiff responded: "See attached affidavit. I have assisted the mujahidin by giving blood to wounded fighters, hiding and transporting their weapons, shopping for their necessities, repairing their vehicles and guiding them around the city of Kabul."

18. Plaintiff's supporting affidavit, dated September 10, 1991, elaborated on his support of the mujahidin as follows: "My father, brothers and I are auto mechanics and we repaired mujahidin vehicles. We also assisted the mujahidin by giving them money and supplies,

guiding them around the city of Kabul to help them with the strategic placement of mines in non-civilian areas, and hiding in their home." (Paragraph 9) "I have helped the mujahidin by giving blood to wounded mujahidin fighters, hiding and transporting their weapons and shopping for their necessities. The mujahidin were always welcome in my home, and they would often come to hide. My wife would cook for them and do their laundry." (Paragraph 11) "I also helped the mujahidin by distributing 'night letters,' or anti-government literature." (Paragraph 12)

19. Paragraph 54 of the affidavit states: "I speak very little English and I therefore required assistance in the preparation of this English language affidavit."

20. A single, consolidated asylum hearing was held before an Immigration Judge in August 1992. Plaintiff, his father, mother and 21-year old brother Rashad all testified about the family's support of the mujahidin, and were cross-examined by the INS[1] trial attorney. They testified in Farsi through an interpreter.

21. During the asylum hearing, Plaintiff testified as follows:

Q: What did you do to help the Mujahedin?
A: When they were coming to the city, they want to go somewhere, I have to guide them to give information, so I have to go with them and show the places, government offices. And also when they were going to do operation, so they were telling me where is this place? I have to go with them and show them that place. And mostly I was distributing night letters also.

Q: Anything else?
A: Sometime if they need grocery or some . . . whatever they need I have to purchase it from the market and deliver it to them.

Q: Anything else?
A: That was the more important things which I was doing. If anything else they want to ask me, maybe I can do.

---

[1] As of March 1, 2003, the functions of the former Immigration and Naturalization Service ("INS") were transferred to the newly-formed DHS.

22. By decision dated August 18, 1992, the Immigration Judge found that the Azatullah family members had all testified "credibly and forthrightly." The Immigration Judge granted asylum to Plaintiff's father, mother and three minor brothers based on past persecution that the father had suffered.

23. The Immigration Judge denied asylum to Plaintiff, Jallah and Rashad, finding they had not suffered past persecution and had no reasonable fear of future persecution because, by the time of the hearing, the Najibullah government of Afghanistan had collapsed.

24. Plaintiff, Jallah and Rashad appealed the denial of asylum to the Board of Immigration Appeals ("BIA"). The appeal, which the INS did not oppose, remained pending in the BIA for nearly six years.

25. In August 1998, the BIA panel affirmed the denial of asylum, with one dissenting vote. Plaintiff, Jallah and Rashad filed a timely motion to reopen the BIA decision based on changed country conditions, specifically, the rise to power in Afghanistan of Taliban religious fundamentalist groups, and their persecution of women and ethnic and religious minorities.

26. By Order dated June 13, 2000, the BIA granted the motion to reopen, and the matter was remanded to the Immigration Judge for a further hearing.

27. In April 2001, Rashad's application for adjustment of status based on his marriage to a United States citizen was granted. Rashad's activities in support of the mujahidin, which were materially indistinguishable from Plaintiff's, did not bar his adjustment of status.

**May 2001 Asylum Hearing**

28. Plaintiff and Jallah filed amended applications for asylum in September 2000, this time based on a well-founded fear of persecution by the Taliban.

29. In his amended application, Plaintiff specifically disclosed: "I and other members of my family, including my father and brothers, supported the mujahidin political resistance in opposition to the Najibullah government before we fled from Afghanistan. The details of our support of the mujahidin are set forth in the record of proceedings before the Immigration Judge in August 1992. My father, brother and I ceased our mujahidin activity upon our arrival in the United States."

30. A second asylum hearing was held in May 2001. At the time of the hearing, the INA provided that asylum "shall not" be granted if the Attorney General determines that "the alien is inadmissible under subclause (I) . . . of section 1182(a)(3)(B)(i) of this title . . . ." 8 U.S.C. § 1158(b)(2)(A)(v) (2001). At the time of the hearing, the referenced section provided that "Any alien who (I) has engaged in terrorist activity . . . is inadmissible." 8 U.S.C. § 1182(a)(3)(B)(i)(I) (2001). This inadmissibility ground was mandatory and not waivable.

31. At the time of the May 2001 hearing, "engag[ing] in terrorist activity" meant "afford[ing] *material support* to any individual, organization, or government in conducting a terrorist activity at any time, including any of the following acts: (I) The *preparation or planning* of a terrorist activity . . . [or] (III) The providing of *any type of material support*, *including a safe house, transportation, communications, funds, false documentation or identification, weapons, explosives, or training,* to any individual the actor knows or has reason to believe has committed or plans to commit a terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iii)(I), (III) (2001). These provisions are materially unchanged in the present statute.

32. By Order dated May 15, 2001, the Immigration Judge granted asylum to Plaintiff and Jallah. By granting asylum, the Immigration Judge necessarily determined that Plaintiff's past support of the mujahidin did not constitute material support of terrorist activity that would have rendered him inadmissible and ineligible for asylum. The INS waived appeal.

**Plaintiff's Life in the United States**

33. Since their arrival in 1991, Plaintiff and Jallah have been productive, law-abiding New York residents. They purchased a home and raised three children – all United States citizens – in Bardonia, New York. Plaintiff supports his family, files tax returns and considers the United States to be his home.

34. Plaintiff, his father and brothers have started several successful family businesses, including auto repair shops, auto parts businesses and auto trading businesses in Queens and Rockland County. For many years, Plaintiff owned and operated Rose's Coffee Shop near Citi Field in Queens. Since 2014, Plaintiff has owned and operated S&H Auto Glass & Muffler, Inc., an auto repair shop in Haverstraw, New York.

35. After waiting one year from the grant of asylum, as required, in May 2002, Plaintiff and Jallah filed I-485 applications for adjustment of status to become permanent residents of the United States. In his application, Plaintiff disclosed: "A description of my activities in support of the Mujahidin is set forth in an affidavit dated September 10, 1991, which was submitted in support of my application for political asylum. A copy of that affidavit is submitted herewith."

36. Jallah's application for adjustment of status was granted in February 2006. On March 30, 2011, she was sworn in as a United States citizen.

37. Plaintiff's entire extended family in the United States are now citizens or permanent residents. He no longer has any family or friends in Afghanistan.

38. In 2015, Plaintiff's son was married to a foreign citizen. Plaintiff was unable to travel abroad during the wedding preparations due to the uncertainty surrounding his travel status and concerns that he would not be permitted to re-enter the United States. Plaintiff has never met the parents of his daughter-in-law.

**Delay and Denial of Plaintiff's Application for Adjustment of Status**

39. Plaintiff's application for adjustment of status remained pending for 17 years. Despite repeated inquiries, USCIS provided no information about the status of the application or the reason for the delay. On January 8, 2019, Plaintiff unexpectedly received a notice scheduling an I-485 interview.

40. During the interview, which was held on February 12 and February 20, 2019, Plaintiff was questioned about his pre-1992 involvement with the mujahidin. There were no new allegations or evidence of any involvement in any alleged "terrorist activity."

41. By decision dated April 3, 2019 (the "Denial"), USCIS denied Plaintiff's application for adjustment of status.

42. The Denial states that "USCIS has determined that you are inadmissible under INA section 212(a)(3)(B) because you provided material support to a terrorist organization as defined under INA Section 212(a)(3)(B)."

43. This determination purports to be based solely on facts that Plaintiff fully disclosed in connection with his application for asylum, which, as the Immigration Judge determined in May 2001, did not render him inadmissible to the United States. Defendants' reliance on those very same facts, nearly 20 years later, to reach a materially different

9

conclusion, is arbitrary and capricious, not in accordance with law, and does not justify the Denial.

44. The Denial further states that Plaintiff is not eligible for a Limited General Exemption from inadmissibility because he was found to be "inadmissible pursuant to INA § 212(a)(3)(B)(iv)(VI)(aa) for providing material support for the commission of a terrorist activity (aiding in the placement of mines and guiding the Mujahedeen around the city when they were planning operations)."

45. This conclusion is not in accordance with law because the statutory requirements are not met. To establish material support for the *commission of a terrorist activity*, the statute requires evidence: a) that Plaintiff's actions supported the "commission" of a terrorist act; b) involving the "use" of weapons or explosives; c) that the act was "intended" to endanger persons or damage property; and d) that Plaintiff knew or should have known that his actions afforded material support for the commission of the terrorist act. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(aa). The administrative record fails to support any of these necessary elements.

46. There is no evidence that the mujahidin Plaintiff guided around Kabul were committing any kind of unlawful activity, no evidence that they used, or even possessed, weapons or explosives while Plaintiff guided them, no evidence that they intended to endanger persons or property, and no evidence that Plaintiff knew or should have known that he was supporting the commission of any unlawful activity. To the contrary, Plaintiff testified that none of the places to which he guided the mujahidin was ever bombed. He also testified that the mujahidin never informed him of their plans, and he did not know their objectives. This testimony was unrefuted.

47. Defendants' conclusion that Plaintiff "aided in the placement of mines" is unsupported by substantial evidence. Plaintiff and the attorney who prepared his 1991 affidavit both explained during the interview that the reference to "the strategic placement of mines in non-civilian areas" was added by counsel as the result of a translation error or misunderstanding during the process of preparing the affidavit, at a time when Plaintiff spoke very little English. Plaintiff has *never*, on direct or cross-examination during his two asylum hearings, or during his two-day adjustment of status interview, testified in his own words that he aided the mujahidin in the placement of mines. Defendants' rejection of this explanation – which was unrefuted – was arbitrary and capricious.

48. The Denial further concludes that Plaintiff is ineligible for a Limited General Exemption on the ground that he was a "member" of various mujahidin groups. This conclusion is arbitrary and capricious because the undisputed evidence in the administrative record established that Plaintiff merely supported the mujahidin and was never a member, what he referred to as a "real" mujahidin. Moreover, this determination is not in accordance with law, because the statutory language applies only to current members, not past members, and there is no dispute that Plaintiff ceased all contact with the mujahidin when he left Afghanistan in 1991.

49. Plaintiff is otherwise eligible for a Limited General Exemption in accordance with the exemption authority set forth in 77 Fed. Reg. 49821-02. Under a Limited General Exemption, Plaintiff's past support of the mujahidin would not render him inadmissible to the United States and would not bar his application for adjustment of status.

50. Plaintiff has been harmed by the Denial, which bars him from receiving lawful permanent residence in the United States. Plaintiff is unable to travel internationally because, without permanent resident status, he risks being denied re-entry to the United States. The

impermanence and uncertainty of his residency in the United States has caused, and continues to cause, distress and anguish to Plaintiff and his family. The Denial further harms Plaintiff by preventing him from ever seeking or attaining United States citizenship, and receiving the rights and privileges of citizenship.

**Controlled Application Review and Resolution Program ("CARRP")**

51. On information and belief, in April 2008, USCIS implemented the Controlled Application Review and Resolution Program ("CARRP"), an agency-wide policy for identifying, processing and adjudicating applications for immigration benefits that raise purported "national security concerns."

52. CARRP directs USCIS officers to screen applications for adjustment of status and other immigration benefits. If a USCIS officer determines that an application presents a purported "national security" concern, the officer will take the application off a routine adjudication track and – without notifying the applicant – place it on a CARRP adjudication track where it is subject to distinct procedures, heightened scrutiny and extra-statutory criteria that result in lengthy delays and denials of benefits to otherwise eligible and worthy applicants.

53. On information and belief, CARRP identifies "national security concerns" based on vague and overbroad criteria that often turn on religious affiliation, national origin or innocuous and lawful activities and associations. These criteria are untethered to the statutory criteria that determine whether a person is eligible for the immigration status or benefit they seek, and are so general that they ensnare individuals who pose no threat to the security of the United States. CARRP disproportionately impacts applicants from Arab, Middle Eastern, Muslim and South Asian countries.

54. Once a USCIS officer identifies a CARRP-defined "national security concern," the application is subjected to CARRP's rules and procedures that guide officers to deny the applications or, if an officer cannot find a basis to deny the application, to delay adjudication as long as possible. On information and belief, once officers identify an applicant as a "national security concern," CARRP instructs officers to look for any reason to deny the application. When no legitimate reason supports denial of an application subjected to CARRP, USCIS officers find spurious or pretextual reasons to deny the application.

55. At no point during the CARRP process is the applicant made aware that he or she has been labeled a national security concern, nor is the applicant ever provided with an opportunity to respond to or contest the classification.

56. On information and belief, Plaintiff's application for adjustment of status was subjected to CARRP. As an Afghan national and practicing Muslim, Plaintiff fits CARRP's overbroad criteria for identifying purported threats to "national security."

57. Plaintiff is not, and has never been, a threat to the national security of the United States.

58. On information and belief, the decisions to find Plaintiff inadmissible based on the very same facts on which he was granted asylum, and to deny Plaintiff's request for a Limited General Exemption, were compelled by CARRP. The reasons given for the Denial lack any legitimate basis and are wholly pretextual.

59. In *Wagafe v. Trump*, Case No. C17-0094-RAJ, pending in the United States District Court for the Western District of Washington, plaintiffs challenge the legality of CARRP (and any successor program) under the APA as arbitrary and capricious and contrary to law.

60. In June 2017, the Court denied in substantial part the government's motion to dismiss the complaint and certified, *inter alia*, a class of plaintiffs whose applications for adjustment of status have been subjected to CARRP (the "Adjustment Class"). *See Wagafe v. Trump*, 2017 WL 2671254 (W.D. Wash. June 21, 2017).

61. On information and belief, Plaintiff is a member of the Adjustment Class and stands to benefit from a ruling in the *Wagafe* class action. The *Wagafe* class action is currently set for trial in August 2020.

## COUNT I

### RELIEF UNDER THE APA
### THE DENIAL IS NOT IN ACCORDANCE WITH LAW
### (Collateral Estoppel)

62. Plaintiff repeats and realleges the allegations of paragraphs 1-61.

63. The May 2001 decision of the Immigration Judge granting Plaintiff asylum was a final agency adjudication.

64. The issue of whether Plaintiff's past support of the mujahidin rendered him inadmissible to the United States was actually and necessarily decided in Plaintiff's favor when he was granted asylum by the Immigration Judge in 2001.

65. Defendants herein had a full and fair opportunity to litigate the issue in the 2001 asylum proceeding.

66. The identical issue is presented in connection with Plaintiff's application for adjustment of status.

67. Because the elements of collateral estoppel are met, Defendants are precluded from finding that Plaintiff is inadmissible to the United States based on his past support of the mujahidin. The Denial of Plaintiff's application for adjustment of status on that ground was therefore not in accordance with law.

68. Accordingly, the Denial should be vacated, and this matter remanded to Defendants with instructions that Defendants are barred from finding Plaintiff inadmissible based on his past support of the mujahidin.

69. Because no other barriers remain to granting Plaintiff's application for adjustment of status, Defendants should be ordered to grant the application.

## COUNT II

### RELIEF UNDER THE APA
### THE DENIAL IS ARBITRARY AND CAPRICIOUS
### (Continuing Asylum Status Cannot Be Reconciled with
### Determination of Inadmissibility on the Same Facts)

70. Plaintiff repeats and realleges the allegations of paragraphs 1-69.

71. In granting Plaintiff's application for asylum, Defendants necessarily concluded that Plaintiff's past support of the mujahidin did not render him inadmissible to the United States. Defendants' contrary determination, nearly 20 years after the fact, is arbitrary and capricious.

72. In the Denial, Defendants did not identify or rely on any facts that were not previously disclosed at the time of Plaintiff's asylum hearing. The determination that Plaintiff is inadmissible based on the very same facts that supported his application for asylum is arbitrary and capricious.

73. Defendants acknowledge that Plaintiff received, and continues to hold, valid asylum status. Defendants' determination that Plaintiff is inadmissible due to material support of terrorism cannot be reconciled with the fact that he continues to hold valid asylum status, and is therefore arbitrary and capricious.

74. Accordingly, the Denial should be vacated, and this matter remanded to Defendants with instructions that Defendants are barred from finding Plaintiff inadmissible based on his past support of the mujahidin.

75. Because no other barriers remain to granting Plaintiff's application for adjustment of status, Defendants should be ordered to grant the application.

### COUNT III

#### RELIEF UNDER THE APA
#### THE DENIAL IS ARBITRARY AND CAPRICIOUS
#### AND NOT IN ACCORDANCE WITH LAW
#### (Eligibility For Limited General Exemption)

76. Plaintiff repeats and realleges the allegations of paragraphs 1-75.

77. Defendants' conclusion that Plaintiff provided material support for the commission of a terrorist activity is arbitrary, capricious, unsupported by substantial evidence and not in accordance with law because the undisputed evidence in the administrative record does not satisfy the required statutory elements.

78. Defendants' conclusion that Plaintiff "aided in the placement of mines" is arbitrary and capricious because it is based entirely on a single reference to "mines" in Plaintiffs' 1991 affidavit, and there was no basis on which to reject Plaintiff's explanation that the use of this word was an error.

79. Defendants' conclusions that Plaintiff was a "member" of the mujahidin or that he provided material supported for the commission of a "terrorist activity" are unsupported by the administrative record, and the conclusion that being a past "member" bars him from consideration for the Limited General Exemption is incorrect as a matter of law.

80. Defendants' determination that Plaintiff is not eligible for a Limited General Exemption was therefore arbitrary and capricious, unsupported by substantial evidence and not in accordance with law.

81. Plaintiff otherwise meets the criteria for a Limited General Exemption.

82. Accordingly, the Denial should be vacated, and this matter remanded to Defendants with instructions that Plaintiff is eligible for consideration, and must be considered, for a Limited General Exemption.

### COUNT IV

### RELIEF UNDER THE APA
### THE DENIAL IS ARBITRARY AND CAPRICIOUS
### AND NOT IN ACCORDANCE WITH LAW
### (Application Of CARRP)

83. Plaintiff repeats and realleges the allegations of paragraphs 1-82.

84. On information and belief, Plaintiff's application for adjustment of status was subjected to CARRP.

85. On information and belief, in accordance with CARRP procedures, Plaintiff's application was unreasonably delayed and ultimately denied for reasons that were entirely pretextual. The unreasonable delay and pretextual denial of Plaintiff's application for adjustment of status under CARRP were arbitrary, capricious and not in accordance with law.

86. Accordingly, the Denial should be vacated, and this matter remanded to Defendants with instructions that Plaintiff's application for adjustment of status must be considered in the absence of CARRP procedures.

## COUNT V

## DECLARATORY JUDGMENT

87. Plaintiff repeats and realleges the allegations of paragraphs 1-86.

88. There is an actual, present, and existing controversy between Plaintiff and Defendants with respect to the legality and propriety of the Denial.

89. Plaintiff is entitled to declarations that: 1) Defendants are barred under the doctrine of collateral estoppel from finding Plaintiff inadmissible based on his past support of the mujahidin; 2) Defendants' determination that Plaintiff is inadmissible while he continues to hold valid asylum status, based on the very same facts on which he was granted asylum, is arbitrary and capricious; 3) Plaintiff is eligible for a Limited General Exemption; and 4) Plaintiff's application for adjustment of status must be reconsidered in the absence of CARRP procedures.

90. Any of the declaratory judgments sought herein would fully and finally resolve the dispute between Plaintiff and Defendants concerning the Denial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for an order and judgment against Defendants as follows:

    a.    Vacating the Denial;

    b.    Entering judgment declaring that:

        1)    Defendants are collaterally estopped from finding Plaintiff inadmissible based on his past support of the mujahidin;

        2)    Defendants' determination that Plaintiff is inadmissible while he continues to hold valid asylum status, based on the very same facts on which he was granted asylum, is arbitrary and capricious;

        3)    Plaintiff is eligible for a Limited General Exemption; and

        4)    Plaintiff's application for adjustment of status must be considered in the absence of CARRP procedures.

    c.    Remanding the matter to Defendants for further proceedings consistent with the Judgment of this Court;

    d.    Awarding Plaintiff reasonable attorney's fees, expenses and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

    e.    Granting Plaintiff such other relief at law and in equity as justice may require.

New York, New York
February 7, 2020

                PROSKAUER ROSE LLP

                By: *Elise A. Yablonski*
                      Elise A. Yablonski
                      Valarie H. McPherson (admission pending)
                      11 Times Square
                      New York, New York 10036-8299
                      (212) 969-3000
                      eyablonski@proskauer.com
                      vmcpherson@proskauer.com

                *Attorneys for Plaintiff Ahmad Seir Azatullah*