UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AHMAD SEIR AZATULLAH,

                                        Plaintiff,

             - against -                                    **20 Civ. 1069 (MKV)**

CHAD F. WOLF, Acting Secretary of the
Department of Homeland Security, KENNETH
CUCCINELLI, II, Acting Director of the United
States Citizenship and Immigration Services,
and LEE F. BOWES, Acting District Director of
the New York District of the United States
Citizenship and Immigration Services,

                                        Defendants.

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF ITS CROSS MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
Attorney for United States of America
86 Chambers Street, Third Floor
New York, New York 10007
Tel: (212) 637-2614

REBECCA R. FRIEDMAN
Assistant United States Attorney

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT .................................................................................1

STATUTORY BACKGROUND................................................................................3

    I.    Asylum in the United States ................................................................3

    II.    Adjustment of Status and Terrorism-Related Inadmissibility Grounds..................4

FACTUAL BACKGROUND ....................................................................................8

    A.    Azatullah's Life in Afghanistan..............................................................8

    B.    Azatullah's Asylum Application and Application for Adjustment of Status .........9

    C.    USCIS's Denial Letter ......................................................................12

    D.    This Action.....................................................................................13

STANDARDS OF REVIEW ...................................................................................13

    I.    Legal Standard for Motions Pursuant to Rule 12(b)(1) .........................13

    II.    Legal Standard for Motions Pursuant to Rule 12(b)(6) .........................14

    III.    Legal Standard for Motions Pursuant to Fed. R. Civ. P. 56 ..................14

ARGUMENT .........................................................................................................15

    I.    This Court Lacks Subject Matter Jurisdiction Over USCIS's Discretionary Decision Not to Grant Azatullah an Exemption ....................................15

        A.    An Applicant Can Seek Review of a Determination Under § 1182(d)(3)(B)(i) Solely Through a Petition for Review Filed With the Court of Appeals ......................................................................15

        B.    This Court Lacks Subject Matter Jurisdiction Under The APA ...............16

    II.    Collateral Estoppel Does Not Apply.......................................................18

        A.    The Issues Are Not Identical.........................................................19

        B.    Azatullah Has Not Established That the Terrorism-Related Activity Bar Was Actually Litigated and Decided ...................................22

    III.    Defendants Are Entitled to Summary Judgment Because USCIS's Denial of Azatullah's Adjustment Application Was Lawful and Was Not Arbitrary and Capricious ....................................................................................30

A.    USCIS Considered the Full Record and Concluded That Plaintiff Is Inadmissible Based on His Provision of "Material Support" to the Mujahidin ................................................................................................31

B.    USCIS Considered the Full Record and Concluded That Plaintiff Is Not Eligible For the Exemption ............................................................36

IV.    Plaintiffs' CARRP Claim Is Based on Conclusory Allegations and Should Also Be Rejected Because USCIS Provided a Satisfactory Explanation for Its Action ........................................................................................................39

CONCLUSION ........................................................................................................................40

# TABLE OF AUTHORITIES

**CASES**                                               **PAGE(s)**

*Ahmed v. Cissna*,
  327 F. Supp. 3d 650 (S.D.N.Y. 2018) ............................................................... 17

*Ahmed v. Mayorkas*,
  719 F. Supp. 2d 1080 (N.D. Cal. 2009) ............................................................ 15

*Ahmed v. Scharfen*,
  No. 08 Civ. 1680 (MHP), 2009 WL 55939 (N.D. Cal. Jan. 7, 2009) .............................. 11

*Al-Saadoon v. Baar*,
  973 F.3d 794 (8th Cir. 2020) ......................................................................... 39

*Alaswad v. Johnson*,
  574 F. App'x 483 (5th Cir. 2014) ..................................................................... 38

*Aldarwich v. Hazuda*,
  2016 WL 1089173 (C.D. Cal. Mar. 18, 2016) .......................................................... 28

*Ali v. Mukasey*,
  529 F.3d 478 (2d Cir. 2008) .................................................................... *passim*

*Al-Rifahe v. Mayorkas*,
  776 F. Supp. 2d 927 (D. Minn. 2011) ................................................................. 20

*Amrollah v. Napolitano*,
  710 F.3d 568 (5th Cir. 2013) .................................................................... 20, 25

*Amrollah v. Napolitano*,
  No. 09 Civ. 952 (FB), 2011 WL 13124032 (W.D. Tex. Jan. 21, 2011) ............................... 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................. 14

*Barahona v. Holder*,
  691 F.3d 349 (4th Cir. 2012) ......................................................................... 32

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................. 14

*Boussana v. Johnson*,
  No. 14 Civ. 3757 (LGS), 2015 WL 3651329 (S.D.N.Y. June 11, 2015) ............................... 11

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*,
    419 U.S. 281 (1974).............................................................................. 30

*Budiono v. Lynch*,
    837 F.3d 1042, (9th Cir. 2016) ......................................................... 6

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962).............................................................................. 30

*C.I.R. v. Sunnen*,
    333 U.S. 591 (1948)...................................................................... 18, 25

*Cardenas v. United States*,
    826 F.3d 1164 (9th Cir. 2016) ......................................................... 20

*Celotex v. Catrett*,
    477 U.S. 317 (1986).............................................................................. 14

*Chen v. Johnson*,
    No. 15 Civ. 3422 (RRM), 2016 WL 4544034 (E.D.N.Y. Aug. 30, 2016) ...................... 17

*Clifford v. U.S. Coast Guard*,
    915 F. Supp. 2d 299 (E.D.N.Y. 2013) .............................................. 15

*Dibble v. Fenimore*,
    545 F.3d 208 (2d Cir. 2008)................................................................ 30

*Empire Trust Co. v. United States*,
    324 F.2d 507 (2d Cir. 1963)................................................................ 13

*Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd.*,
    247 F.3d 437 (2d Cir. 2001)................................................................ 30

*Fuli Zhang v. Barr*,
    782 F. App'x 81 (2d Cir. 2019) ......................................................... 17

*Gelb v. Royal Globe Ins. Co.*,
    798 F.2d 38 (2d Cir. 1986)................................................................... 18

*Glara Fashion, Inc. v Holder*,
    No. 11 Civ. 889 (PAE), 2012 WL 352309 (S.D.N.Y. Feb. 3, 2012)........................ 15

*Gully v. Nat'l Credit Union Admin.*,
    341 F.3d 155 (2d Cir. 2003)................................................................ 30

*Haile v. Holder*,
    658 F.3d 1122 (9th Cir. 2011) ........................................................................ 31

*Herrera v. Wyoming*,
    139 S. Ct. 1686 (2019) .................................................................................... 19

*Hosseini v. Nielsen*,
    911 F.3d 366 (6th Cir. 2018) .................................................................... 32, 34

*Immigration & Naturalization Serv. v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ........................................................................................ 35

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ............................................................... 14

*Islam v. Kelley*,
    No. 17 Civ. 22237 (JLK), 2019 WL 2716318 (S.D. Fla. June 28, 2019) ........ 23

*Islam v. U.S. Department of Homeland Security*,
    136 F. Supp. 3d 1088 (N.D. Cal. 2015) .................................................... 26, 28

*J. Andrew Lange, Inc. v. F.A.A.*,
    208 F.3d 389 (2d Cir. 2000) ............................................................................ 30

*Janjua v. Neufeld*,
    933 F.3d 1061 (9th Cir. 2019) .................................................................. *passim*

*Kakar v. United States Citizenship & Immigration Servs.*,
    No. 16 Civ. 5032 (KAM), 2020 WL 1545422 (E.D.N.Y. Mar. 31, 2020) ............... *passim*

*Karpova v. Snow*,
    497 F.3d 262 (2d Cir. 2007) ...................................................................... 30, 35

*Keane v. Chertoff*,
    419 F. Supp. 2d 597 (S.D.N.Y. 2006) ............................................................ 18

*Khalil v. McAleenan*,
    No. 18 Civ. 7903 (DMG) (KSX), 2020 WL 1015826 (C.D. Cal. Jan. 21, 2020) ...... *passim*

*Khan v. Holder*,
    766 F.3d 689 (7th Cir. 2014) .......................................................................... 31

*Khan v. Johnson*,
    160 F. Supp. 3d 1199 (C.D. Cal. 2016) .......................................................... 28

*Khan v. Scharfen,*
     No. 08 Civ. 1398 (SC), 2009 WL 941574 (N.D. Cal. Apr. 6, 2009) ............................... 16

*Lawrence + Mem'l Hosp. v. Burwell,*
     812 F.3d 257 (2d Cir. 2016) ............................................................................................ 21

*Luckett v. Bure,*
     290 F.3d 493 (2d Cir. 2002) ............................................................................................ 13

*Makarova v. United States,*
     201 F.3d 110 (2d Cir. 2000) ............................................................................................ 13

*Matter of A-C-M,*
     27 I. & N. Dec. 303 (BIA 2018) ....................................................................................... 7

*Matter of Rodarte-Roman,*
     23 I. & N. Dec. 905 (BIA 2006) .............................................................................. 4, 5, 22

*Matter of S-K-,*
     23 I. & N. Dec. 936 (BIA 2006) .................................................................................. 5, 6

*Montana v. United States,*
     440 U.S. 147 (1979) ................................................................................................. 19, 29

*Ndom v. McAleenan,*
     780 F. App'x 188 (5th Cir. 2019) .................................................................................... 33

*Ndom v. Nielsen,*
     No. 16 Civ. 3432, 2019 WL 339117 (N.D. Tex. Jan. 28, 2019) ............................... *passim*

*Orwa A. v. Whitaker,*
      No. 18 Civ. 2043 (ECT) (KMM), 2018 WL 6492353 (D. Minn. Dec. 10, 2018) .......... 39

*Panchishak v. Dep't of Homeland Sec.,*
     No. 08 Civ. 6448 (WHP), 2009 WL 2135299 (S.D.N.Y. July 15, 2009) ........................ 11

*Pancho Villa Rest., Inc. v. U.S. Dep't of Labor,*
     796 F.2d 596 (2d Cir. 1986) ............................................................................................ 30

*Pearl River Union Free Sch. Dist. v. Duncan,*
     56 F. Supp. 3d 339 (S.D.N.Y. 2014) ............................................................................... 14

*Qubadi v. Hackbarth,*
     No 17 Civ. 06286 (TJH) (MRWx), 2019 WL 6139110 (C.D. Cal. Aug. 27, 2019) ........ 37

*Sagier v. United States Citizenship & Immigration Serv.,*
    No. 11 Civ. 05537 (JSC), 2012 U.S. Dist. LEXIS 189916 (N.D. Cal. May 3, 2012) ...... 23

*Selevan v. N.Y. Thruway Auth.,*
    584 F.3d 82 (2d Cir. 2009) ............................................................................ 14

*Shabaj v. Holder,*
    718 F.3d 48 (2d Cir. 2013) ............................................................................ 16

*Shipping Fin. Servs. Corp. v. Drakos,*
    140 F.3d 129 (2d Cir. 1998) .......................................................................... 14

*Singh v. USCIS,*
    No. 15 Civ. 1411 (JMF), 2016 WL 1267796 (S.D.N.Y. Mar. 30, 2016) ........................ 17

*Singh v. Wiles,*
    No. 07 Civ. 1151 (RAJ), 2010 WL 1727973 (W.D. Wa. Apr. 27, 2010) ................ 7, 8, 16

*Singh–Kaur v. Ashcroft,*
    385 F.3d 293 (3d Cir. 2004) ...................................................................... 31, 32

*Solorzano v. Sessions,*
    No. 18 Civ. 25 (JCS), 2018 WL 1811792 (N.D. Cal. Apr. 17, 2018) ............................ 15

*Spelman v. McHugh,*
    65 F. Supp.3d 40 (D.D.C. 2014) .................................................................... 15

*Tahir v. Lynch,*
    654 F. App'x 512 (2d Cir. 2016) .................................................................... 33

*United States v. Alcan Aluminum Corp.,*
    990 F.2d 711 (2d Cir. 1993) .......................................................................... 22

*Vela-Estrada v. Lynch,*
    817 F. 3d 69 (2d Cir. 2016) .......................................................................... 17

*Wan Shih Hsieh v. Kelly,*
    569 F.2d 1179 (2d Cir. 1978) ........................................................................ 17

**STATUTES**

5 U.S.C. § 701 ................................................................................ 13, 16, 17, 18

5 U.S.C. § 706(2)(A) ................................................................................ 30

8 U.S.C. § 1101(a) ................................................................................ 4, 22

8 U.S.C. § 1158 ................................................................................................ 3, 25, 35

8 U.S.C. § 1159 ................................................................................................ 4, 22, 35

8 U.S.C. § 1182 ..................................................................................................... *passim*

8 U.S.C. § 1189 ............................................................................................................ 5

8 U.S.C. § 1252 ......................................................................................................... 8, 16, 17

28 U.S.C. § 2201 ....................................................................................................... 13

28 U.S.C. § 2202 ....................................................................................................... 13

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5070 (Nov. 29, 1990) ............... 4

REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (May 11, 2005) ........................... 6, 11

The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept
   and Obstruct Terrorism Act of 2001 ("Patriot Act"), Pub. L. No. 107-56, 115 Stat. 272 (Oct.
   26, 2001) ........................................................................................................ 5

**RULES**

Fed. R. Civ. P. 12 .................................................................................................... 13, 14

Fed. R. Civ. P. 56 ..................................................................................................... i, 14

**REGULATIONS**

8 C.F.R. § 209.2 ...................................................................................................... 4, 22

8 C.F.R. § 208.2 ......................................................................................................... 3

77 Fed. Reg. 49821-02 (Aug. 17, 2012) ................................................................................ 7

**OTHER AUTHORITIES**

*How the Anti-Terrorism Bill Allows for Detention of People Engaging in Innocent Associational
   Activity,* American Civil Liberties Union (Oct. 23, 2001), available at
   https://www.aclu.org/other/how-anti-terrorism-bill-allows-detention-people-engaging-
   innocent-associational-activity (last visited November 30, 2020) .................................... 31

*New Anti-Terrorism Legislation*, Immigration and Naturalization Commissioner James W. Ziglar
October 31, 2001 memorandum at 6, available at
https://www.uscis.gov/sites/default/files/document/memos/patriot.pdf (last visited
November 30, 2020) ........................................................................................................31

147 Cong. Rec. S11010 (daily ed. Oct. 25, 2001) ........................................................................ 20

USCIS, Mem. HQ 70/2.1, *Revised Guidance on the Adjudication of Cases involving Terrorist-
Related Inadmissibility Grounds and Amendment to the Hold Policy for such Cases*
(Feb. 13, 2009) (available at
https://www.uscis.gov/sites/default/files/document/memos/terror-
related_inadmissibility_13feb09.pdf) (last visited Dec. 7, 2020).....................................11

U.S. Dep't of State, Foreign Terrorist Organizations,
located at https://www.state.gov/foreign-terrorist-organizations/ (listing the groups
and explaining the process) (last visited on Dec. 2, 2020) ..................................................5

U.S. Dep't of State, Terror Exclusion List, located at https://www.state.gov/terrorist-exclusion-
list/ (listing the groups and explaining the process) (last visited on Dec. 2, 2020) ............5

Defendants Chad F. Wolf, Kenneth Cuccinelli, and Lee F. Bowes (collectively, the "government"), by their attorney, Audrey Strauss, Acting United States Attorney for the Southern District of New York, respectfully submit this Memorandum of Law in Support of their Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment.

## PRELIMINARY STATEMENT

In April 2019, U.S. Citizenship and Immigration Services ("USCIS") denied the application of plaintiff Ahmad Seir Azatullah ("Azatullah" or "plaintiff") to adjust status from asylee to lawful permanent resident because USCIS determined that he was inadmissible under 8 U.S.C. § 1182(a)(3)(B) for providing material support to the mujahidin, an undesignated (Tier III) terrorist organization, and because he did not qualify for an exemption of inadmissibility under 8 U.S.C. § 1182(d)(3)(B)(i) due to specific actions he took in support of a terrorist organization. USCIS's inadmissibility determination was correct and was supported by the record. Plaintiff asks this Court to vacate USCIS's denial of Azatullah's application, arguing that USCIS is barred by the doctrine of collateral estoppel from denying the application, and that its decision was arbitrary and capricious.

As an initial matter, this Court does not have subject matter jurisdiction to review USCIS's determination that plaintiff does not qualify for the exemption of inadmissibility. Congress has unambiguously provided that USCIS's determination to exercise discretion over the inadmissibility exemption is reviewable solely through the filing of a "petition for review" with the "court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. §§ 1182(d)(3)(B)(i); 1252(b)(1) and (2). Here, plaintiff challenges USCIS's determination that he is not eligible for the exemption, and since the challenge was not

brought in the Court of Appeals, this Court lacks subject matter jurisdiction over plaintiff's claim regarding the exemption and should dismiss that count.

Second, USCIS is not collaterally estopped from denying Azatullah's application. Collateral estoppel does not apply because the ground of inadmissibility with respect to Tier III terrorist organizations did not exist until the USA PATRIOT Act was passed in October 2001, a few months after plaintiff was granted asylum, and the issues were therefore not identical. Second Circuit precedent also requires that in order for collateral estoppel to apply, the issue has to have been "actually litigated." *See Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008). There is no indication in the record that the issue of plaintiff's inadmissibility based on his activities with the mujahidin was actually litigated before the immigration judge who granted him asylum, nor could it have been since the inadmissibility criterion at issue in Azatullah's application did not exist at the time of the asylum grant.

Third, USCIS's decision to deny Azatullah's application is not arbitrary and capricious because USCIS considered the full record and properly concluded that plaintiff is inadmissible based on his material support for the mujahidin. Under the APA, federal courts review agency actions under a deferential standard, and look to whether the agency considered relevant evidence and articulated a satisfactory explanation for its action. Here, the record supports USCIS's determination that Azatullah provided material support to a Tier III terrorist organization. USCIS's determination that plaintiff is ineligible for an exemption is also not arbitrary and capricious because USCIS considered the full record and properly concluded that plaintiff is not eligible for the exemption.

Plaintiff also alleges that Azatullah's application should be remanded for a determination independent of the strictures of Controlled Application Review and Resolution Program

("CARRP").  Plaintiff alleges that his case was subjected to CARRP and "ultimately denied for reasons that were entirely pretextual," Compl. ¶ 85, without providing sufficient factual support. As set forth below in the government's analysis of plaintiff's APA claim, USCIS's denial was not "pretextual" but rather was supported by substantial evidence and the agency provided a satisfactory explanation for its denial.

Therefore, the Court should grant the government's motion for summary judgment and dismiss plaintiff's claims.

## STATUTORY BACKGROUND

### I.      Asylum in the United States

The Immigration and Nationality Act (the "INA") permits any individual "who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status," to apply for asylum in this country, subject to certain specified exceptions.  8 U.S.C. §§ 1158(a)(1), (2).  An asylum applicant must demonstrate either past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  *Id.* §§ 1101(a)(42)(A), 1158(b)(1)(B)(i).  Congress has expressly afforded discretion to the Secretary of Homeland Security or the Attorney General (depending on whether the Department of Homeland Security or the Department of Justice has jurisdiction over the asylum application) to determine whether to grant asylum in accordance with the requirements and procedures the government has established.[1]  *Id.* § 1158(b)(1)(A). Individuals who receive asylum may remain legally in the United States indefinitely, obtain employment authorization, seek permission to travel in and out of the United States, and apply for

---

[1] An individual may seek asylum either affirmatively before USCIS or defensively during removal proceedings in immigration court.  8 C.F.R. §§ 208.2, 1208.2.

permanent resident status after one year.  *Id.* § 1159(b).  An alien is generally not eligible for asylum if he or she has engaged in terrorist activity as defined by 8 U.S.C. § 1182.  *See id.* § 1158(b)(2)(A)(v) (referring to an alien described in subclause (I), (II), (III), (IV), or (VI) of 8 U.S.C. §1182(a)(3)(B)(i).

## II.     Adjustment of Status and Terrorism-Related Inadmissibility Grounds

The Secretary may, in his discretion, adjust certain aliens admitted to the United States as asylees to permanent residence status.  8 U.S.C. § 1159(b).  Adjustment of status is a distinctive legal "admission" to the United States.  *Matter of Rodarte-Roman*, 23 I. & N. Dec. 905, 908 (BIA 2006).  The statute defines "lawfully admitted for permanent residence" as a term of art meaning "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws."  8 U.S.C. § 1101(a)(20).  Asylees who are physically present in the United States for at least one year and who are otherwise eligible may apply for adjustment of status.  *See* 8 U.S.C. § 1159(b)(1).  The asylee applying for adjustment of status bears the burden of proving that he is admissible at the time of the application.  *See* 8 U.S.C. §§ 1159(b), 1361; 8 C.F.R. § 209.2.

Among other sections, 8 U.S.C. § 1182 provides a list of categories of aliens who are inadmissible to the United States.  As relevant here, an alien who "has engaged in terrorist activity" is inadmissible.  8 U.S.C. § 1182(a)(3)(B)(i)(I).  Congress first promulgated the terrorism-related inadmissibility grounds in the Immigration Act of 1990, Pub. L. No. 101-649; § 601, 104 Stat. 4978, 5070 (Nov. 29, 1990), codified at 8 U.S.C. § 1182(a)(3)(B).  However, since the original terrorism-related inadmissibility grounds, further legislative amendments have passed, expanding these inadmissibility provisions.  In October 2001, several months after Azatullah's May 2001 asylum hearing, the PATRIOT Act significantly broadened the definition of "terrorist

organization" by introducing two new categories of terrorist organizations - in addition to the then-existing Foreign Terrorist Organizations designated under 8 U.S.C. § 1189 by the Department of State (also referred to as Tier I terrorist organizations),[2] the PATRIOT Act added "organizations otherwise designated . . . by the Department of State" (Tier II terrorist organizations),[3] and undesignated terrorist organizations, as described at 8 U.S.C. § 1182(a)(3)(B)(vi)(III), frequently referred to as Tier III terrorist organizations.  The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, § 411, 115 Stat. 272, 378  (Oct. 26, 2001) ("PATRIOT Act"),Thus, after Congress passed the PATRIOT Act, as relevant here, the definition of a "terrorist organization" under the INA included not only organizations designated under 8 U.S.C. § 1189, but also any "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, terrorist activities."  8 U.S.C. § 1182(a)(3)(B)(vi)(III).  Unlike with the Tier I and II groups, Tier III terrorist organizations are not formally designated at a high level.  Rather, the criteria for identifying them are self-contained within the INA.  *Id.*  Decision makers such as immigration adjudicators or immigration judges can find that a group falls within the definition of an undesignated terrorist organization based on the facts at issue in a particular case.  *See Matter of S-K-*, 23 I. & N. Dec. 936, 939 (BIA 2006).

---

[2] "Tier I" organizations are foreign terrorist organizations (FTOs) designated by the Secretary of State under 8 U.S.C. § 1189.  *See* U.S. Dep't of State, Foreign Terrorist Organizations, located at https://www.state.gov/foreign-terrorist-organizations/ (listing the groups and explaining the process) (last visited on Dec. 2, 2020); *see* 8 U.S.C. § 1182(a)(3)(B)(vi)(I).  The list includes such groups as "al-Qaida."  *See* U.S. Dep't of State, Foreign Terrorist Organizations.

[3] "Tier II" organizations are terrorist organizations otherwise designated by the Secretary of State and which appear on the Department of State's "Terrorist Exclusion List."  *See* U.S. Dep't of State, Terror Exclusion List, located at https://www.state.gov/terrorist-exclusion-list/ (listing the groups and explaining the process) (last visited on Dec. 2, 2020); *see* 8 U.S.C. § 1182(a)(3)(B)(vi)(II).

On May 11, 2005, the REAL ID Act was passed, further expanding the definition of a Tier III terrorist organization.  REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (May 11, 2005).  Specifically, while the definition of Tier III terrorist organization under the PATRIOT Act included only groups which engage in activities described in "subclauses (I), (II), or (III) of clause (iv)," after enactment of the REAL ID Act the definition includes three additional subclauses of "engaging in terrorist activity," now covering engagement in activities described in "subclauses (I) through (VI) of clause (iv)."  *Compare* 8 U.S.C. § 1182(a)(3)(B)(vi)(III) (2001) *with* 8 U.S.C. § 1182(a)(3)(B)(vi)(III) (2005).[4]  Under the current statute, if a group of two or more individuals engages in terrorist activity, or has a subgroup that engages in terrorist activity under the INA definition, it meets the INA definition of a "terrorist organization."  *See id.* § 1182(a)(3)(B)(vi)(III); *see also Budiono v. Lynch*, 837 F.3d 1042, (9th Cir. 2016) (noting that the PATRIOT Act "created a new category of terrorist organizations . . . beyond those groups formally listed by the U.S. government" (Callahan, J., concurring in part)).  A Tier III terrorist organization's acts need not be violent, so long as the group's activities involve: (1) committing or inciting to commit terrorist activity; (2) preparing or planning a terrorist activity; (3) gathering information on potential targets for terrorist activity; (4) soliciting funds or other things of value for a terrorist activity or terrorist organization; (5) soliciting individuals for terrorist activity or a terrorist organization; or (6) providing material support to an individual or to a terrorist organization.  8 U.S.C. § 1182(a)(3)(B)(iv), (vi)(III).  Additionally, the definition does not consider an organization's goals or intent, only its actions; § 1182 does not provide exceptions for

---

[4] As relevant here, this change expanded the definition of a Tier III terrorist organization from groups that directly committed, prepared or planned, or scouted targets for terrorist activity, to include groups that  provided material support for terrorist activity, terrorist organizations, or their members.  8 U.S.C. § 1182(a)(3)(B)(iv)(VI).

"freedom fighters" "or for those acting with good intentions.  *See Matter of S-K-*, 23 I. & N. Dec. at 941–42.

Any alien who provides "material support" to a terrorist organization is inadmissible.  8 U.S.C. §§ 1182(a)(3)(B)(i)(I), 1182(a)(3)(B)(iv)(VI).  The definition of "material support" in the INA is broad:

> To commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training.

8 U.S.C. § 1182(a)(3)(B)(iv)(VI).  Material support can be provided under various circumstances, including support "to a terrorist organization described in clause (vi)(III), or to any member of such an organization."  8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd) (emphasis added).[5]

Congress provided the Secretaries of State and Homeland Security, in consultation with the Attorney General, the authority to make certain exemptions from the terrorism-related inadmissibility grounds found at subsection (a)(3)(B).  *See* § 1182(d)(3)(B)(i); *see also, e.g.*, *Singh v. Wiles*, No. 07 Civ. 1151 (RAJ), 2010 WL 1727973, at *2 (W.D. Wa. Apr. 27, 2010).  In 2012, the Secretary exercised her discretion to not apply 8 U.S.C. §§ 1182(a)(3)(B)(iv)(IV), (iv)(V), (iv)(VI), and (i)(VIII) to certain aliens who are inadmissible under 1182(a)(3)(B)(i) due to activities and associations with a Tier III terrorist organization.  77 Fed. Reg. 49821-02 (Aug. 17, 2012).  This is known as the Limited General Exemption, and as relevant here, provides an exemption, applied on a case by case basis, for providing material support to a Tier III terrorist organization, when certain conditions are present.  *Id.*; *see also* AR 07.  Should a person be granted

---

[5] An individual provides "material support" to a terrorist organization if the act has a logical and reasonably foreseeable tendency to promote, sustain, or maintain the organization, even if only to a *de minimis* degree.  *See Matter of A-C-M*, 27 I. & N. Dec. 303 (BIA 2018).

this exemption, the inadmissibility ground would not be applied to the individual, and thus he or she would not be inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I).

Congress also explicitly provided that the decision to grant or not grant an exemption under subsection (d)(3)(B)(i) is in the "Secretary's sole unreviewable discretion" and that review of any determination to grant or deny an exemption is limited to a proceeding for review of a final order of removal pursuant to 8 U.S.C. § 1252:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review such a determination or revocation except in a proceeding for review of a final order of removal pursuant to section 1252 of this title, and review shall be limited to the extent provided in section 1252(a)(2)(D).

8 U.S.C. § 1182(d)(3)(B)(i); *see also, e.g.*, *Singh*, 2010 WL 1727973, at *2 n.3.  Section 1252 of the INA provides that a final order of removal may be reviewed only through the filing of a "petition for review" with the "court of appeals for the judicial circuit in which the immigration judge completed the proceedings."  8 U.S.C.  §§ 1252(b)(1) and (2); *see also* § 1252(a)(2)(D) (judicial review is permitted on constitutional claims or questions of law only "upon a petition for review filed with an appropriate court of appeals in accordance with this section").  Therefore, the only way Congress has permitted an individual to seek judicial review of USCIS's exemption determination is by way of a petition for review filed with the court of appeals.

## FACTUAL BACKGROUND

### A.  Azatullah's Life in Afghanistan

Azatullah is a native of Afghanistan.  AR 09.[6]  Azatullah and his family (including his father and brothers) were members of the mujahidin, the political opposition to the Afghan

---

[6] Administrative Record submitted July 13, 2020, as amended October 20, 2020 (ECF No. 18, 23-1) ("AR").

government at the time of their involvement.  AR 04.  As explained in more detail below, Azatullah helped the mujahidin by purchasing food for them, guiding them around government areas in Kabul to help with the strategic placement of mines, distributing night letters, donating blood to wounded mujahidin fighters, hiding the mujahidin in his home, transporting weapons for the mujahidin and hiding their weapons in his home.  AR 05.

In January 1991, Azatullah's father and brother were arrested by the Afghan police, who discovered other mujahidin members and weapons in the family home.  AR 327.  The day after Azatullah's father was arrested, Azatullah, with the assistance of the mujahidin, left Kabul with his wife and his younger brother.  AR 404-08.  A few months later, Azatullah's father, mother, and younger brothers also traveled to the United States.  AR 412-13.

### B.  Azatullah's Asylum Application and Application for Adjustment of Status

Azatullah applied for asylum in September 1991, along with other family members.  AR 304-08.  Azatullah's 1991 asylum affidavit states that he supported several mujahidin groups.  AR 24.  The affidavit stated that while he lived in his father's house, he supported the mujahidin: "My father brothers and I are auto mechanics and we repaired mujahidin vehicles.  We also assisted the mujahidin by giving them money and supplies, and guiding them around the city of Kabul to help them with the strategic placement of mines in non-civilian areas."  AR 25 at ¶ 9.  After moving out of his father's house, Azatullah personally became involved with the mujahidin: "I have helped the mujahidin by giving blood to wounded mujahidin fighters, hiding and transporting their weapons and shopping for their necessities.  The mujahidin were always welcome in my home, and they would often come to hide."  AR 25 at ¶ 11.  The affidavit also stated that Azatullah "helped the mujahidin by distributing 'night letters,' or anti-government literature."  AR 26 at ¶ 12.

The asylum hearing for Azatullah and his other family members was held in August 1992 before Immigration Judge ("IJ") Patricia Rohan.  AR 309-426.  Azatullah testified about the ways he helped the mujahidin, including by purchasing groceries, guiding them around the city to show them government offices, and distributing night letters.  AR 399-400.  IJ Rohan issued an oral decision regarding the applicants, AR 288-299, in which she granted asylum to Azatullah's father, mother, and three minor brothers, AR 294, 299, and denied the applications of Azatullah, his wife Jallah, and his brother Rashad.  AR 296, 298.  IJ Rohan stated that Azatullah had not shown past persecution and did not have a well-founded fear of future persecution based on his affiliation with the mujahidin because the mujahidin were now aligned with the then-current Afghan government. AR 297-99.

Azatullah, his wife, and brother appealed, and the Board of Immigration Appeals ("BIA") affirmed the denial of asylum.  AR 244-48.  They filed a motion to reopen the asylum proceedings based on their fear of the Taliban's rise to power in Afghanistan, and the motion was granted and they were given a second asylum hearing.  AR 197-198.

The reopened hearing occurred before IJ Rohan on May 15, 2001.  SR 01.[7]  During the hearing, Azatullah and his wife both testified as to their fear of returning to Afghanistan because they would be harmed by the Taliban because they are Muslim Shia.  SR 08, 12.  Both Azatullah and his wife were granted asylum at the conclusion of the hearing.  SR 13.

In 2002, Azatullah filed his I-485 application for permanent residence based on his asylum status.  ECF No. 15 at ¶ 35.  As part of his adjustment of status application, Azatullah was

---

[7] The May 2001 transcript is included as a Supplement to the Administrative Record.  *See* ECF No. 23-2 ("SR").

interviewed over two days in early 2019.   AR 09-14, 679-766.[8]   There was a delay between

Azatullah's filing of his I-485 application and his interview because of a limit of a cap on the

number of asylum adjustments and because of a 2008 USCIS policy that put applications on hold.[9]

During the interviews, Azatullah testified that he "helped the Mujahidin by purchasing food for

them, showing them the government areas in Kabul, distribut[ing] night letter[s] on behalf of

Mujahidin, donat[ing] blood, hid[ing] Mujahidin in [his] home, transport[ing] weapons for the

Mujahidin and hid[ing] their weapons in [his] home."   AR 05, 715-16, 718-29, 744-45, 748-753.

Azatullah also provided a sworn statement on February 20, 2019, which covered that assistance.

AR 09-14.   During the interview, Azatullah provided inconsistent testimony, including on whether

he transported weapons for the mujahidin.   *See, e.g.*, AR 749 at 71:17-22 (USCIS officer: "Q.

You're explaining, just let me make sure.   Now because here now you're telling me that you did

transport weapon.   But the question before this you said you were not very sure about the cargo

---

[8] The Denial Letter notes that the interview took place on January 12, 2019, and that is also the date on the Sworn Statement.  AR 05, AR 09.  However, the transcript shows the interview took place in February.  AR 735; *see also* Compl. ¶ 40 (interview took place on Feb. 12 and 20, 2019.)

[9] Congress previously subjected asylum-based adjustment applications to an annual cap of 10,000 admissions.  This cap led to a backlog of adjustment applications, which INS and then USCIS adjudicated under a first in, first out policy.  As a result, an asylee who filed his or her adjustment application faced an approximate waiting period of nine to ten years.  *See Panchishak v. Dep't of Homeland Sec.*, No. 08 Civ. 6448 (WHP), 2009 WL 2135299, at *1 (S.D.N.Y. July 15, 2009) (discussing the numerical cap and backlog of applications).  The REAL ID Act lifted the numerical cap on asylum based-adjustment applications.   *See* REAL ID Act of 2005, Pub. L. No. 109-13 § 101(g)(1)(B)(i).  In 2008, USCIS implemented a policy for certain asylum applications, by which USCIS would delay adjudication because an applicant's conduct would render him or her inadmissible under a terrorism-related inadmissibility ground. The purpose of the hold policy was to prevent denial of an immigration benefit application in the event Congress would create or the Executive would implement an exemption.  *See Boussana v. Johnson*, No. 14 Civ. 3757 (LGS), 2015 WL 3651329, at *3 (S.D.N.Y. June 11, 2015) (discussing the USCIS hold policy); *Ahmed v. Scharfen*, No. 08 Civ. 1680 (MHP), 2009 WL 55939, at *2-3 (N.D. Cal. Jan. 7, 2009) (same); USCIS, Mem. HQ 70/2.1, *Revised Guidance on the Adjudication of Cases involving Terrorist-Related Inadmissibility Grounds and Amendment to the Hold Policy for such Cases* (Feb. 13, 2009) (available at https://www.uscis.gov/sites/default/files/document/memos/terror-related_inadmissibility_13feb09.pdf) (last visited Dec. 7, 2020).

was it a weapon or not.  But now you're saying yes we did."), AR 750 at 72:9-11 ("Q. You're talking about the weapon transporting weapon, okay, because now the statements [are]inconsistent.").  Ultimately, Azatullah testified that he transported weapons for the mujahidin on one occasion.  AR 12-13, 752.

### C.  USCIS's Denial Letter

USCIS denied Azatullah's application for adjustment of status via letter dated April 3, 2019.  AR 01-08 (the "Denial Letter").  The Denial Letter concluded that Azatullah was "inadmissible under INA section 212(a)(3)(B) because you provided material support to a terrorist organization as defined under INA Section 213(a)(3)(B)."  AR 06.

The Denial Letter also concluded that Azatullah was not eligible for the Limited General Exemption:

> While material support to a Tier III terrorist organization can be exempted, your actions subject you to additional grounds of inadmissibility not subject to exemption.  You are inadmissible pursuant to [§ 1182](a)(3)(B)(iv)(VI)(aa) for providing material support for the commission of a terrorist activity (aiding in the placement of mines and guiding the Mujahedeen around the city when they were planning operations).  You also appear to be inadmissible pursuant to [§ 1182](a)(3)(B)(iv)(II) for preparing or planning a terrorist activity.  These grounds of inadmissibility are not subject to the Limited General Exemption.

AR 07.  The Denial Letter specifically addressed Azatullah's "disavowal" of his affidavit statement that he helped with the strategic placement of mines, noting that USCIS did not find the disavowal "to be credible."  AR 07.  The Denial Letter explained:

> Although you completed the affidavit shortly after your arrival in the United States, it was executed and filed with the Immigration Court when you were represented by counsel, you did not correct it despite the fact that you submitted a supplemental affidavit a few months later when your child was born and you did not advise the Immigration Judge that the affidavit was incorrect when you later testified in support of your application.  USCIS further finds that your testimony at the asylum hearing regarding guiding the Mujahedeen around the city when they were planning operations, and your testimony at the adjustment of status interview regarding

hiding weapons, to be unambiguous and to establish that you were assisting them
to carry out terrorist activities.

AR 07.

### D.  This Action

On February 7, 2020, plaintiff sought review of the denial of his I-485 application through

filing this action.  Plaintiff asserts claims under the Administrative Procedure Act ("APA"), 5

U.S.C. § 701, *et seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  Plaintiff asserts

that 1) USCIS is collaterally estopped from finding that he is inadmissible to the United States

based on his past support to the mujahidin (Count I, Compl. ¶¶ 62-69); 2) USCIS's conclusion that

plaintiff is inadmissible based on his past support to the mujahidin is arbitrary and capricious

because he has already been granted asylum based on the same facts (Count II, Compl. ¶¶ 70-75);

3) USCIS's determination that plaintiff is ineligible for a Limited General Exemption is arbitrary

and capricious (Count III, Compl. ¶¶ 76-82); and 4) plaintiff's application was subjected to

CARRP and denied entirely for pretextual reasons (Count IV, Compl. ¶¶ 83-86).  Plaintiff's fifth

count requests declaratory relief (Count V, Compl. ¶¶ 87-90).   Plaintiff filed his summary

judgment brief in November 2020.  S*ee* ECF No. 28 ("Pl. SJ Br.").

### STANDARDS OF REVIEW

### I.      Legal Standard for Motions Pursuant to Rule 12(b)(1)

"'A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it.'"  *Luckett v.*

*Bure*, 290 F.3d 493, 496 (2d Cir. 2002) (quoting *Makarova v. United States*, 201 F.3d 110, 113

(2d Cir. 2000)); *see Empire Trust Co. v. United States*, 324 F.2d 507 (2d Cir. 1963) (per curiam);

*see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter

jurisdiction, the court must dismiss the action.").  Petitioner carries the burden of establishing that

subject matter jurisdiction exists over his complaint.  *See Luckett*, 290 F.3d at 497; *Makarova*, 201

F.3d at 113 ("A petitioner asserting subject matter jurisdiction has the burden of proving by a

preponderance of the evidence that it exists.").  On a motion to dismiss for lack of subject matter

jurisdiction, a court assumes as true the factual allegations set forth in the complaint.  *See Shipping*

*Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

## II.    Legal Standard for Motions Pursuant to Rule 12(b)(6)

Rule 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6)

should be granted when the complaint fails to allege all the required elements of a cause of action.

*See Pearl River Union Free Sch. Dist. v. Duncan*, 56 F. Supp. 3d 339, 351 (S.D.N.Y. 2014)*; In re*

*Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 562 (S.D.N.Y. 2014) (granting a motion to dismiss

under Rule 12(b)(6) where the defendant argued that the complaint "fail[ed] to adequately allege

the key elements of a . . . cause of action").  A court must "assume all 'well-pleaded factual

allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'"

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 679 (2009)).  Allegations that are "no more than conclusions[] are not entitled to the

assumption of truth," and "'naked assertion[s]' devoid of 'further factual enhancement'" or "the-

defendant-unlawfully-harmed-me accusation[s]" are not sufficient to show that a petitioner is

entitled to relief.  *Ashcroft*, 556 U.S. at 678-79 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 557 (2007)).  Nor must a court accept as true "legal conclusions" or "'a legal conclusion

couched as a factual allegation.'"  *Id.*

## III.    Legal Standard for Motions Pursuant to Fed. R. Civ. P. 56

Summary judgment is appropriate where "there is no genuine [dispute] as to any material

fact and that the [movant] is entitled to a judgment as a matter of law" Fed. R. Civ. P. 56; *see also*

*Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).  Courts have noted that the traditional summary

judgment standard—including a demonstration "that there is no genuine issue [of] material fact"—

"does not apply in cases where a district court is reviewing a final agency action under the APA."

*Spelman v. McHugh*, 65 F. Supp.3d 40, 44 (D.D.C. 2014).   "[T]he Second Circuit has allowed

appeals of agency decisions to be styled as motions for summary judgment . . . while also stating

that '[g]enerally, a court reviewing an agency decision is confined to the administrative record

compiled by that agency when it made the decision.'"  *Clifford v. U.S. Coast Guard*, 915 F. Supp.

2d 299, 307 (E.D.N.Y. 2013) (citations omitted).[10]

## ARGUMENT

### I.  This Court Lacks Subject Matter Jurisdiction Over USCIS's Discretionary Decision Not to Grant Azatullah an Exemption

#### A.  An Applicant Can Seek Review of a Determination Under § 1182(d)(3)(B)(i) Solely Through a Petition for Review Filed With the Court of Appeals

A person who provided material support to a terrorist organization is inadmissible.  *See* 8

U.S.C. §§ 1182(a)(3)(B)(i)(I), (a)(3)(B)(iv)(VI).  As explained in the statutory background section,

USCIS may, in its discretion, choose to not apply subsection (a)(3)(B)(iv)(VI) to certain qualifying

individuals.  *See id.* § 1182(d)(3)(B)(i) (noting that the determination is in the Secretary's "sole

unreviewable discretion").  Congress has provided that USCIS's determination to exercise that

discretion is reviewable solely through the filing of a "petition for review" with the "court of

appeals for the judicial circuit in which the immigration judge completed the proceedings."  *Id.*

§§ 1182(d)(3)(B)(i); 1252(b)(1) and (2); *see also Ahmed v. Mayorkas*, 719 F. Supp. 2d 1080, 1085

---

[10] As Your Honor noted in the Civil Case Management Plan and Scheduling Order, "Rule 56.1 statements shall not be required."  *See* ECF No. 26; *see also Glara Fashion, Inc. v Holder*, No. 11 Civ. 889 (PAE), 2012 WL 352309, at *1 n. 1 (S.D.N.Y. Feb. 3, 2012).

(N.D. Cal. 2009) (finding that the plain language of subsection (d)(3)(B)(i) bars it from reviewing any decision by USCIS to exempt an individual from subsection (a)(3)(B)); *Solorzano v. Sessions*, No. 18 Civ. 25 (JCS), 2018 WL 1811792, at *5 (N.D. Cal. Apr. 17, 2018) (agreeing with *Ahmed* that USCIS's denial of an exemption is not subject to judicial review); *Amrollah v. Napolitano*, No. 09 Civ. 952 (FB), 2011 WL 13124032, at *2 (W.D. Tex. Jan. 21, 2011) (finding that "the plain language of [subsection (d)(3)(B)(i)] deprives the Court of jurisdiction for reviewing waiver decisions"); *Singh*, 2010 WL 1727973, at *2 (holding that subsection (d)(3)(B)(i) makes the determination to grant an exemption under that section to be unreviewable); *Khan v. Scharfen*, No. 08 Civ. 1398 (SC), 2009 WL 941574, at *6 (N.D. Cal. Apr. 6, 2009) (finding that subsection (d)(3)(B)(i) precludes judicial review of exemptions to terrorism-related inadmissibility).

Here, plaintiff challenges USCIS's discretionary determination under subsection (d)(3)(B)(i) that he is not eligible for the Limited General Exemption by asserting that USCIS's adjudication of the inadmissibility exemption was arbitrary and capricious and not in accordance with the law.  However, this challenge is not properly heard in district court but instead must be raised in a petition for review with the court of appeals, which is the only way Congress has permitted judicial review of a determination under subsection (d)(3)(B)(i).  Therefore, this Court must dismiss this challenge for lack of subject matter jurisdiction.  *See Shabaj v. Holder*, 718 F.3d 48, 51 (2d Cir. 2013) (holding that a district court lacks jurisdiction over plaintiff's claim because 8 U.S.C. § 1252(a)(2)(D) requires that the claim be raised "upon a petition for review filed with an appropriate court of appeals").

### B.  This Court Lacks Subject Matter Jurisdiction Under The APA

In addition to lacking subject matter jurisdiction because 8 U.S.C. § 1182(d)(3)(B)(i) specifically limits review to a court of appeals, this Court also lacks subject matter jurisdiction

under the APA.  Under 5 U.S.C. § 701(a)(1), the judicial review provisions of the APA do not apply to the extent that another statute precludes judicial review.  *Shabaj*, 718 F.3d at 52 (finding no jurisdiction under the APA where statute precluded judicial review).  Courts apply this principle in the immigration context.  *See, e.g.*, *Singh v. USCIS*, No. 15 Civ. 1411 (JMF), 2016 WL 1267796, at *3 (S.D.N.Y. Mar. 30, 2016) (citing the language at 8 U.S.C. § 1252(a)(5), "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter," as precluding judicial review by a district court under § 701(a)(1)); *Chen v. Johnson*, No. 15 Civ. 3422 (RRM), 2016 WL 4544034, at *3 (E.D.N.Y. Aug. 30, 2016) (finding no jurisdiction under the APA where statutory language made clear that the court of appeals is the exclusive forum).

As discussed above, Congress unambiguously provided that any judicial review of a determination under subsection (d)(3)(B)(i) must be raised with the proper court of appeals.  *See* § 1182(d)(3)(B)(i).  Like the courts in *Shabaj*, *Singh*, and *Chen*, this Court should find that this statutory language precludes district court review of USCIS's decision regarding the Limited General Exemption, and hold that this Court does not have subject matter jurisdiction under the APA pursuant to 5 U.S.C. § 701(a)(1).

In addition, under 5 U.S.C. § 701(a)(2), the judicial review provisions of the APA do not apply to the extent that agency action is committed to the agency discretion by law.  *See Wan Shih Hsieh v. Kelly*, 569 F.2d 1179, 1182 (2d Cir. 1978) (matters solely within the discretion of INS are not reviewable under the APA); *Vela-Estrada v. Lynch*, 817 F. 3d 69, 72 (2d Cir. 2016) (finding no jurisdiction under the APA where the BIA's decision to not certify an untimely appeal is committed to agency discretion by law); *Fuli Zhang v. Barr*, 782 F. App'x 81, 82 (2d Cir. 2019) (finding no jurisdiction under the APA because the BIA's decision to reopen *sua sponte* is

committed to agency discretion); *Ahmed v. Cissna*, 327 F. Supp. 3d 650, 671 (S.D.N.Y. 2018) ("The APA exempts from judicial review agency actions that are committed to agency discretion by law." (internal quotations omitted)); *Keane v. Chertoff*, 419 F. Supp. 2d 597, 601-602 (S.D.N.Y. 2006) (citing to the plain language of § 1255(a) labeling adjustment of status as a discretionary act as a reason for finding no jurisdiction under the APA).

Congress unambiguously provided that the determination to grant an exemption is within the "Secretary's sole unreviewable discretion." 8 U.S.C. § 1182(d)(3)(B)(i). Therefore, this Court should also conclude that USCIS's determination regarding the exemption is not reviewable pursuant to 5 U.S.C. § 701(a)(1) and hold that this Court lacks subject matter jurisdiction.

## II.   Collateral Estoppel Does Not Apply

Plaintiff's argument that USCIS is collaterally estopped from finding Azatullah inadmissible based on his support of the mujahidin because the IJ determined that Azatullah was eligible for asylum in 2001 is unavailing. Collateral estoppel or issue preclusion is "designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally," not to "create vested rights in decisions that have become obsolete or erroneous with time." *C.I.R. v. Sunnen*, 333 U.S. 591, 599 (1948). Collateral estoppel applies when: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding must have been "actually litigated and actually decided," (3) there was "a full and fair opportunity for litigation in the prior proceeding," and (4) the issues previously litigated were "necessary to support a valid and final judgment on the merits." *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986).

As set forth below in detail, collateral estoppel does not apply because the issues presented in plaintiff's adjustment application are not identical to the issues presented in plaintiff's

immigration court proceedings.  Specifically, § 1182's ground of inadmissibility with respect to Tier III organizations was not enacted until after plaintiff was granted asylum.  In addition, there is no indication in the record that the issue of plaintiff's admissibility was actually litigated before the immigration judge that granted him asylum.

### A.  The Issues Are Not Identical

Plaintiff's argument that "the relevant provisions of Section 1182(a) are essentially unchanged from 2001 to 2019," and that the "2001 and 2019 versions of the statutory language are, in all relevant respects, the same," Pl. SJ Br. at 12, 16, is incorrect.  The IJ granted Azatullah's asylum application on May 15, 2001.  SR 01.  The concept of a Tier III terrorist organization designation did not exist until October 2001.  Therefore the issues of (1) whether the mujahidin fell with the new definition of a Tier III organization, and (2) whether Azatullah provided "material support" to the mujahidin and triggered the terrorism-related inadmissibility grounds bar, was not identical to the bar for terrorism-related activity considered during asylum proceedings and could not have arisen during the asylum proceedings before the IJ in May 2001.

The Supreme Court has explained that "an exception to collateral estoppel is . . . triggered when controlling principles of law have changed."  *Montana v. United States*, 440 U.S. 147, 161-62 (1979); *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019) ("Even when the elements of issue preclusion are met, . . . an exception may be warranted if there has been an intervening 'change in [the] applicable legal context.'").  Here, as explained in Statutory Background Section II, approximately five months after the IJ adjudicated Azatullah's asylum application, the terrorism-related inadmissibility grounds set forth in 8 U.S.C. § 1182(a)(3)(B) changed significantly when the PATRIOT Act expanded them, including creating two new tiers of terrorist organizations.  The

provisions changed in 2005, when the REAL ID Act expanded the definition of a Tier III terrorist organization.

Plaintiff mistakenly argues that the 2001 and 2019 statutes were not "materially changed," focusing on the Fifth Circuit's decision in *Amrollah v. Napolitano*, 710 F.3d 568 (5th Cir. 2013)*,* which Plaintiff states is "almost exactly on all fours with this case." Pl. SJ Br. at 15-16. *Amrollah* held that the determination that an alien did not provide material support to *any* "individual" *or* "organization" in conducting a terrorist activity has a preclusive effect against a subsequent finding that the alien provided material support to "a group of two or more individuals" engaged in terrorist activity. Pl. SJ Br. at 15-16 (citing *Amrollah*, 710 F.3d at 573). But Plaintiff's argument ignores the fact that § 1182 was expanded in 2001 to include a new classification of terrorist organization. *See Cardenas v. United States*, 826 F.3d 1164, 1170 (9th Cir. 2016) (referring to the revised version of § 1182(a)(3)(B) as "a broad provision that excludes aliens on a variety of terrorism-related grounds") (citation omitted); *Al-Rifahe v. Mayorkas*, 776 F. Supp. 2d 927, 929-30 (D. Minn. 2011) (describing the changes made by the PATRIOT Act and the REAL ID Act and using the terms "expanded," "broadened," and "created."). The legislative history also indicates that the PATRIOT Act expanded the definition of terrorist organizations to include a new category of undersigned terrorist organization:

> [8 U.S.C. §1182(a)(3)(B)(vi)] . . . *creates* a definition of "terrorist organization," which is *not defined under current law*, for purposes of making an alien inadmissible or removable. It defines a terrorist organization as one that is (1) designated by the Secretary of State as a terrorist organization under the process supplied by current law; (2) designated by the Secretary of State as a terrorist organization for immigration purposes; or (3) a group of two or more individuals that commits terrorist activities or plans or prepares to commit (including locating targets for) terrorist activities.

147 Cong. Rec. S11010 (daily ed. Oct. 25, 2001) (reading the section by section analysis of the PATRIOT Act into the Congressional Record) (emphasis added).[11]  Unlike earlier defined terrorist organizations which were designated at a higher level, this change allowed for an IJ or USCIS adjudicator to determine that a specific group fell within the Tier III category based on the facts of that case.  *See* Statutory Background Section II.

Plaintiff also unpersuasively argues that the Tier III terrorist organization category would have been encompassed within the earlier statute's provision regarding affording "*material support to any individual, organization, or government in conducting a terrorist activity* at any time."[12]  Pl. SJ Br. at 15.  If "Tier III terrorist organizations" were already encompassed within the broader understanding of the 2001 version of the statute, then the affirmative decision by Congress to add the Tier III category in 2001 would be pointless surplusage.  And that reading of the 2001 version of the statute would violate fundamental principles of statutory interpretation.  *See, e.g.*, *Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257, 265 (2d Cir. 2016) (explaining that one of the "most basic interpretive cannons" is that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

---

[11] The government and advocacy organizations also recognized the PATRIOT Act's addition of Tier III to be a significant change.  *See* Immigration and Naturalization Commissioner James W. Ziglar October 31, 2001 memorandum "New Anti-Terrorism Legislation," at 6 ("[B]y expanding the definitions of 'engaged in terrorist activity' and 'terrorist organization,' the law acts to increase the classes of aliens ineligible for certain forms of relief . . . , such as adjustment of status . . . ."), *available at* https://www.uscis.gov/sites/default/files/document/memos/patriot.pdf (last visited November 30, 2020); American Civil Liberties Union, How the Anti-Terrorism Bill Allows for Detention of People Engaging in Innocent Associational Activity (Oct. 23, 2001) (noting that the creation of undesignated terrorist organizations "allows for detention and deportation of individuals who provide lawful assistance to groups that are not designated as terrorist organizations."), *available at* https://www.aclu.org/other/how-anti-terrorism-bill-allows-detention-people-engaging-innocent-associational-activity (last visited November 30, 2020).

[12] 8 U.S.C. §1182(a)(3)(B)(iii)(2001).

In addition, collateral estoppel also does not apply because the issues at stake in asylum and adjustment of status applications are not identical, and instead pertain to different issues.  In an asylum proceeding, an asylum applicant must demonstrate either past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i).  By contrast, adjustment of status is a distinctive legal "admission" to the United States.  *Matter of Rodarte-Roman*, 23 I. & N. Dec. at 908.  The asylee applying for adjustment of status bears the burden of proving that he is admissible at the time of the application. *See* 8 U.S.C. §§ 1159(b), 1361; 8 C.F.R. § 209.2.

Here, the Court should decline to apply collateral estoppel where the issues and the relevant statutes considered by the immigration court when it granted plaintiff asylum were not identical to the issues and statutes considered when USCIS adjudicated plaintiff's adjustment application and determined that he was ineligible for an exemption.

### B. Azatullah Has Not Established That the Terrorism-Related Activity Bar Was Actually Litigated and Decided

Plaintiff incorrectly claims that USCIS cannot find him inadmissible because the immigration judge who granted him asylum in 2001 had to necessarily have found him admissible based on the same facts and circumstance in order to grant him asylum.  Pl. SJ Br. at 16-19.  Second Circuit precedent requires that in order for collateral estoppel to apply, the issue must have been "actually litigated."  *See Ali*, 529 F.3d at 489 ("The 'fundamental notion' of the doctrine of collateral estoppel, or issue preclusion, 'is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies.'" (quoting *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 718–19 (2d Cir. 1993)).  Here, because the pertinent issue—Azatullah's material support

to a Tier III terrorist organization—was not actually litigated before the IJ who decided his application for asylum, the IJ's decision cannot collaterally estop USCIS in this case.

Numerous courts have recently held that USCIS is not collaterally estopped from denying an application for adjustment of status because the issues were not actually litigated and decided in earlier immigration court proceedings. *See, e.g.*, *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019) ("[W]e hold that Janjua's inadmissibility on terrorism-related grounds was not actually litigated, because the issue was not in fact raised, contested, or submitted to the IJ for determination in Janjua's asylum proceeding."); *Khalil v. McAleenan*, No. 18 Civ. 7903 (DMG) (KSX), 2020 WL 1015826, at *3 (C.D. Cal. Jan. 21, 2020) (even though plaintiff "made his connections to Jamiat-i-Islami known to the IJ in his asylum proceedings," the actual issue of whether he was inadmissible for providing material support to a Tier III terrorist organization was not actually litigated); *Islam v. Kelley*, No. 17 Civ. 22237 (JLK), 2019 WL 2716318, at *3 (S.D. Fla. June 28, 2019) (explaining that the "administrative record shows that the 'actually litigated' requirement was not satisfied during the asylum proceeding, and therefore the agency's decision is not barred by collateral estoppel."); *Ndom v. Nielsen*, No. 16 Civ. 3432, 2019 WL 339117, at *6 (N.D. Tex. Jan. 28, 2019), *aff'd sub nom. Ndom v. McAleenan*, 780 F. App'x 188 (5th Cir. 2019) (granting defendants' motion for summary judgment on APA claim based on the doctrine of collateral estoppel because "the question whether Ndom is inadmissible because he engaged in a terrorist activity was not 'actually litigated' during Ndom's asylum proceedings"); *Sagier v. United States Citizenship & Immigration Serv.*, No. 11 Civ. 05537 (JSC), 2012 U.S. Dist. LEXIS 189916, at *18-20 (N.D. Cal. May 3, 2012) (holding that issue preclusion argument was an unpersuasive ground to bar USCIS from denying I-485 application because plaintiff did not establish that the

issue of her relationship with the terrorist organization and whether it would render her inadmissible was actually litigated in asylum proceedings to bar litigation in the district court).

In *Janjua*, the court explained:

> Janjua's membership in and work for the MQM were discussed at length at the merits hearing, including whether he had ever used violence or intimidation to further the organization's goals. Yet, these topics were explored for their relevance to Janjua's purported basis for persecution; no one raised, or even hinted at, these topics as potential grounds for inadmissibility under § 1182(a)(3)(B)(i). Neither party ever addressed whether the MQM was a Tier III terrorist group—this category did not exist at the time of the merits hearing . . . . And neither party addressed whether Janjua's support for the MQM would make him inadmissible . . . .

*Id.* at 1067–68. Therefore, while "Janjua's work for the MQM was addressed in the asylum proceedings, the specific issue of whether he was inadmissible based on that work was not raised, contested, or submitted for determination. It was not actually litigated in Janjua's asylum proceeding, and issue preclusion does not apply." *Id.* at 1068.

Similarly in *Ndom*, the district court held that USCIS was not collaterally estopped from denying an alien's application for adjustment of status based on the applicant's engagement in terrorist activity, despite the Ninth Circuit's prior determination that the plaintiff was eligible for asylum. 2019 WL 339117, at *6–7 ("[A]lthough the IJ evaluated Ndom's affiliation with MFDC during the asylum proceedings, the IJ never reached a determination on the question whether Ndom's activities with MFDC barred him from a grant of asylum."). In reaching this conclusion, the district court in *Ndom* noted that the IJ had discussed whether Ndon's actions "could be considered a terrorist activity," but then had made no finding with regard to Ndom's admissibility or inadmissibility under § 1182.

Here, similar to the above cases, the IJ's order that granted Azatullah asylum contains no mention whatsoever of the terrorist activity bar. SR 10-14. Furthermore, the record contains no indication that at any stage of the removal proceedings did the immigration judge or the parties

discuss the terrorism-related bar to asylum, not even the limited type of consideration or comment by the IJ, which the district court found insufficient to trigger collateral estoppel in *Ndom*. *See generally* AR 309-426 (transcript of August 1992 hearing).  As plaintiff acknowledges, the focus of his 1992 asylum hearing was "on whether the applicants still reasonably feared persecution in light of Afghanistan's regime change, not the details of the mujahidin activities that Mr. Azatullah had or had not supported." Pl. SJ Br. at 30.  And while Azatullah's involvement with the mujahidin was raised during his asylum proceedings, he was not questioned about details of his support because the focus of that hearing was "the applicants' well-founded fear of persecution by the Taliban." *Id.*  The issue of whether Azatullah was inadmissible for providing material support to a Tier III terrorist organization could not have been "actually litigated" during his asylum proceedings because the Tier III terrorist organization did not exist at that time.  *See Janjua*, 933 F.3d at 1066 (the issue cannot have been "raised, contested, [or] submitted for determination" in a prior proceeding if that issue did not exist at the time of the proceeding).  The Supreme Court has held that collateral estoppel is not intended to "create vested rights in decisions" that become "obsolete or erroneous with time."  *Sunnen*, 333 U.S. at 599.  Here, Azatullah attempts to assert a right in a decision that has become obsolete with the passage of new laws; however, the intervening change renders the doctrine of collateral estoppel unavailable in his case.

Plaintiff's reliance on *Amrollah* is unavailing.  *See* Pl. SJ Br. at 18.  In *Amrollah*, the record established that the IJ *did* reach a determination on Amrollah's material support of the mujahedeen. *Amrollah*, 710 F.3d at 570 (explaining that "[a]lthough the Service attorney hints, or hinted that Respondent's support of the Mujahedeen indicated violent activity which might disqualify the Respondent from being eligible for asylum," the IJ "conclude[d] that Respondent's testimony showed he did not commit any violent act," and that he was therefore eligible for asylum under 8

U.S.C. § 1158).  *Amrollah* also found the issue of whether the applicant was "inadmissible" under the INA was actually litigated, based on the government's extensive cross-examination of the applicant about his activities in question.  *Id.* at 571.  In *Amrollah*, the question of the plaintiff's inadmissibility under the terrorism-related inadmissibility grounds was raised, contested by the parties, submitted for determination by the court, and determined.  *Amrollah* is not controlling, and the record in this case provides no basis for a similar conclusion here.  Nor does plaintiff's case resemble *Islam v. U.S. Department of Homeland Security*, where the precise issue of whether plaintiff participated in terrorist activity was "actually litigated" during the asylum proceeding through questions on cross examination, and by the fact that the parties, "during closing argument, each addressed whether Islam was involved in terrorist activity."  136 F. Supp. 3d 1088, 1092 (N.D. Cal. 2015).

Plaintiff instead incorrectly argues that the Court should apply collateral estoppel as a matter of inference:  "[b]y granting asylum, the Immigration Judge necessarily, and actually, decided that Mr. Azatullah was not inadmissible under Section 1182(a)(3)(B)."  *See* Pl. SJ Br. at 18-19.  However, plaintiff's argument ignores that "the 'necessarily decided' element of collateral estoppel is distinct from and 'cannot be conflated with' the 'actually litigated' element of collateral estoppel.  *Ndom*, 2019 WL 339117, at *7; 18 Moore's Federal Practice - Civil § 132.03[2][a] (2020) (issue preclusion "applies only to issues that were directly litigated and not to those that merely could have been litigated").  The Second Circuit is clear that for collateral estoppel to apply, the issue has to have been "actually litigated."  *Ali*, 529 F.3d at 489.  A recent Eastern District of New York decision correctly rejected a similar attempt to invoke collateral estoppel to preclude USCIS from considering plaintiff's admissibility for purposes of an application to adjust status based on a previous grant of asylum.  *See Kakar v. United States Citizenship & Immigration Servs.*,

No. 16 Civ. 5032 (KAM), 2020 WL 1545422, at *10 (E.D.N.Y. Mar. 31, 2020).  *Kakar* explained that plaintiff's argument used "circular" reasoning to allege that the issue of admissibility was "actually litigated and actually decided" because if he was inadmissible, he would not have been granted asylum.  *Id.* at *11.  Ultimately, *Kakar* held that the notion that "because courts are obligated to assess admissibility in determining eligibility for asylum, even if admissibility is not addressed in the proceedings or final decision, the issue of admissibility has been actually litigated . . . runs counter to clearly established principles of collateral estoppel in the Second Circuit."  *Id.*

A recent decision in the Central District of California also examined the difference between the requirements "actually litigated" and "necessarily decided."  *See Khalil*, 2020 WL 1015826.  Like here, the defendants in *Khalil* argued that collateral estoppel did not preclude them from denying plaintiff's application to adjust status because the IJ who granted plaintiff asylum could not have considered grounds for inadmissibility that were codified by the PATRIOT Act after the IJ made his asylum decision.  *Id.*, at *1.  Plaintiff argued that the pre-and post-PATRIOT Act versions of 8 U.S.C. § 1182 included similar definitions of terrorist activity, and thus plaintiff "could not have received asylum 'unless the IJ first determined that the applicant had not engaged in terrorist activity.'"  *Id.*  As *Khalil* noted, the cases the plaintiff cited focused on whether the terrorist activity was "necessarily or impliedly decided" and as "*Janjua* makes clear, . . . whether or not an issue was *necessarily decided* in a previous proceeding, collateral estoppel does not apply unless that issue was also *actually litigated* in that proceeding."  *Id.*  *Khalil* ultimately held that "*Janjua* is more consistent" with Defendants' position – that plaintiff's inadmissibility due to his provision of material support to a Tier III terrorist organization could not have been actually litigated in plaintiff's asylum proceeding because that was not a basis for inadmissibility when plaintiff received asylum.  *Id.* at *2.  Here, like in *Janjua* and *Khalil*, neither party could have

addressed whether the mujahidin "was a Tier III terrorist group - this category did not exist at the time of the merits hearing."  *Janjua*, 933 F.3d at 1068; *Khalil*, 2020 WL 1015826, at *2.

Plaintiff's argument that "at least four federal district courts and the Fifth Circuit have ruled that collateral estoppel bars USCIS from finding an applicant for adjustment of status inadmissible based on alleged material support of terrorist activity where, as here, those same facts were presented to the Immigration Judge and asylum was granted," Pl. SJ Br. at 10, fails to account for cases like *Janjua*, *Khalil*, and *Kakar*.  Those cases have explained why the necessary-implication approach advocated by plaintiff is incorrect.  For example, Judge Matsumoto in *Kakar* specifically rejected three California district court cases cited by plaintiff – namely, *Khan v. Johnson*, 160 F. Supp. 3d 1199 (C.D. Cal. 2016), *Aldarwich v. Hazuda*, 2016 WL 1089173 (C.D. Cal. Mar. 18, 2016), and *Islam*, 136 F. Supp. 3d at 1094 – because they employed "circular reasoning" in conflating the "actually litigated" requirement with the "necessarily decided" requirement."  2020 WL 1545422, at *11.[13]  *Khalil* also rejected arguments based on the necessary implication cases relied on by Azatullah.  *Compare* Pl. SJ Br. at 18-19 (citing *Khan*, 160 F. Supp. 3d at 1210, and *Islam*, 136 F. Supp. 3d at 1092), *with Khalil*, 2020 WL 1015826, at *1-2 (rejecting *Khan* and *Islam*).  This Court should strictly interpret the "actually litigated" requirement, and not find that it is satisfied as a matter of inference, as Azatullah suggests.

Contrary to Azatullah's assertions, in determining whether to apply collateral estoppel based on prior asylum proceedings, courts must consider whether the asylum proceedings involved the "'actual litigation' of issues upon which the government's later denial of an immigration benefit turns," and if such issues "were not, or could not have been, actually litigated, collateral

---

[13] *Kakar* also explained "in light of the Ninth Circuit's recent affirmance in *Janjua v. Neufeld*, these California district court decisions regarding collateral estoppel doctrine in adjustment of status proceedings cannot be considered good law or relied upon by this court."  *Id.*

estoppel cannot apply." *Khalil*, 2020 WL 1015826, at *3.  Here there was no evidence or argument presented at the asylum hearing regarding whether Azatullah's material support for the mujahidin actually met the bar to terrorism-related activity.  Rather, any discussion of Azatullah's activities with the mujahidin concerned the basis for his persecution claims.  Pl. SJ Br. at 30 (explaining that the 1992 hearing focused "on whether the applicants still reasonably feared persecution in light of Afghanistan's regime change, not the details of the mujahidin activities that Mr. Azatullah had or had not supported" and the asylum proceedings focused on the "the applicants' well-founded fear of persecution by the Taliban.").  When Plaintiff was granted asylum in May 2001, the category of Tier III terrorist organizations did not exist; therefore, this issue could not have been "raised, contested, and submitted for determination" in Plaintiff's asylum proceeding, and collateral estoppel cannot apply.  *Janjua*, 933 F.3d at 1067-68; *Khalil*, 2020 WL 1015826, at *3.

Plaintiff argues that collateral estoppel prevents against the harm of wasting judicial resources.  Pl. SJ Br. at 10.  That is not a proper consideration here, as the Ninth Circuit explained in *Janjua*:  "[P]recluding an issue that was not actually litigated - *i.e.*, not raised, contested, and submitted for determination - does not conserve judicial resources or facilitate reliance on the earlier judgment because resources were not expended on the issue in the first place."  *Janjua*, 933 F.3d at 1067.  Plaintiff's argument that "necessary implication" satisfies the "actually litigated" requirement, Pl. SJ Br. at 16-17, would, if accepted, "expand the province of issue preclusion and encroach upon the province of claim preclusion."  *Janjua*, 933 F.3d at 1067.  While both issue preclusion and claim preclusion preserve judicial resources, minimize inconsistent decisions, and prevent superfluous suits, "one of the key distinctions between claim preclusion and issue preclusion is that the former bars relitigation of any and all matters that were or could have been raised at that adjudication . . . , while the latter precludes relitigation of only those issues that were

'actually and necessarily determined,'" *Id.* (citing *Montana*, 440 U.S. at 153). Here, given that the issue was not actually litigated, collateral estoppel does not apply.

**III.     Defendants Are Entitled to Summary Judgment Because USCIS's Denial of Azatullah's Adjustment Application Was Lawful and Was Not Arbitrary and Capricious**

Under the APA, federal courts review agency actions under a deferential standard, under which such actions may be only disturbed if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Pancho Villa Rest., Inc. v. U.S. Dep't of Labor*, 796 F.2d 596, 597 (2d Cir. 1986). The court must determine whether the agency has "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a 'rational connection between the facts found and the choice made.'" *J. Andrew Lange, Inc. v. F.A.A.*, 208 F.3d 389, 391 (2d Cir. 2000) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The scope of the review is "narrow, and courts should not substitute their judgment for that of the agency." *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007) (citation omitted); *see also Gully v. Nat'l Credit Union Admin.*, 341 F.3d 155,163 (2d Cir. 2003) (quoting *Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd.*, 247 F.3d 437, 441 (2d Cir. 2001)) ("Our review under these standards is narrow and 'particularly deferential.'").

An agency's factual findings do not need to be explicit or well explained. A decision should be upheld even if it is "of less than ideal clarity if the agency's path may reasonably be discerned." *Dibble v. Fenimore*, 545 F.3d 208, 219 (2d Cir. 2008). In reviewing an agency's decision, the court should consider whether the decision was based on "a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974) (citation omitted).

Here, the Court should grant summary judgment in Defendants' favor because USCIS did not arbitrarily or capriciously deny Azatullah's adjustment of status application.  Instead, USCIS considered the full record and properly concluded that plaintiff is inadmissible based on his material support of the mujahidin.  And with regards to USCIS's decision that Azatullah is not eligible for the Limited General Exemption, assuming arguendo that lack of subject matter jurisdiction were not an issue, USCIS's decision is not arbitrary and capricious because USCIS considered the full record and properly concluded that plaintiff is not eligible for the exemption.

### A.   USCIS Considered the Full Record and Concluded That Plaintiff Is Inadmissible Based on His Provision of "Material Support" to the Mujahidin.

USCIS denied Azatullah's adjustment of status application because he "provided material support to a terrorist organization as defined under INA Section 213(a)(3)(B)."  AR 06.  The statute says that "material support" includes "a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training."   8 U.S.C. § 1182(a)(3)(B)(iv)(VI).  However, the list is "not exhaustive" as shown by the fact that the statute uses the word "including."   *Khan v. Holder*, 766 F.3d 689, 698 (7th Cir. 2014) (considering the expansive view of material support and holding that petitioner engaged in material support even though he didn't provide any of the things in the list); *Singh–Kaur v. Ashcroft*, 385 F.3d 293, 299 (3d Cir. 2004) (noting that "material support" is a broad concept that is not limited to the enumerated examples).

Here, the record reflects ample evidence that Azatullah provided material support to the mujahidin.  For starters, Azatullah's purchase of groceries for the mujahidin, AR 399 at 97:24-25, AR 715-16, amounts to material support.  *See, e.g., Haile v. Holder*, 658 F.3d 1122, 1129 (9th Cir.

2011) ("The BIA did not err in determining that Haile's activities, . . . supplying the ELF with provisions such as sugar, shoes, and cigarettes, . . . amount in the aggregate to material support"); *Singh–Kaur*, 385 F.3d at 299 (deferring to the BIA's determination that the "provision of food and setting up tents" was within the definition of "material support"). Azatullah's distribution of night letters, AR 26 at ¶ 12, AR 477, AR 724-25, also amounts to material support. *Hosseini v. Nielsen*, 911 F.3d 366, 377 (6th Cir. 2018), *cert. denied sub nom. Hosseini v. McAleenan*, 140 S. Ct. 127 (2019) (copying and distributing flyers is material support).

In addition, as plaintiff acknowledges, Pl. SJ Br. at 34, providing information or directions constitutes material support. *Barahona v. Holder*, 691 F.3d 349, 351-52, 356 (4th Cir. 2012) (upholding finding of material support because alien allowed terrorists to use his kitchen, gave them directions through the jungle, and occasionally allowed them to stay overnight). Here, Azatullah acknowledges guiding the mujahidin around the city. As he explained:

> When they were coming to the city, they want to go somewhere, I have to guide them to give information, so I have to go with them and show the places, government offices. And also when they were going to do operation, so they were telling me where is this place? I have to go with them and show them that place.

AR 399 at 97:17-21; *see also* AR 469 (explaining that he assisted the mujahidin by "guiding them around the city of Kabul."), AR 718-723.

Azatullah also engaged in additional acts that would fall under the broad category of material support such as donating blood, hiding and transporting mujahidin weapons, and allowing the mujahidin to hide in his house. *See, e.g., Singh–Kaur v. Ashcroft*, 385 F.3d at 299 (noting that "material support" is a broad concept); *Kakar*, 2020 WL 1545422, at *4 (finding alien inadmissible under § 1182(a)(3)(B)(i)(I) for providing material support to the Taliban by cleaning, cooking and washing clothes); AR 05, 715-16, 725-30, 744-45, 748-753.

As the Denial Letter explained, Azatullah "did not demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the Mujahedeen groups [he was] affiliated with and supported were not engaging in terrorist activities."  AR 06. The record reveals the opposite – that Azatullah was aware that others in his family had guided the mujahidin for the purpose of setting mines, AR 731-32, and as discussed above, he provided material support.  "More than merely saying a matter is not true is needed to survive summary judgment or to show USCIS erred by relying on evidence in the record."  *Ndom v. McAleenan*, 780 F. App'x 188, 190 (5th Cir. 2019).  Here, Azatullah cannot make such a showing by clear and convincing evidence because the record reflects that he was aware of the violent activities of the mujahidin, and yet he continued to provide them material support—precisely the type of evidence that courts have relied on to reject similar claims.  *See id.* ("Even if Ndom knew nothing else about MFDC—not the widespread campaign of violence, torture, and killings indicated in the record— he knew about the bridge explosion and remained a member of MFDC . . . . It was not arbitrary and capricious for USCIS to find he failed to meet his burden."); *see also Tahir v. Lynch*, 654 F. App'x 512, 515 (2d Cir. 2016) (petitioner "did not provide clear and convincing evidence that he was unaware that the SSP was a terrorist organization" where he knew that sectarian violence was problematic, knew group was violent as he feared they would threaten to torture, kidnap, or kill him, and he was asked to produce anti-Shia materials for the SSP).

Plaintiff advances two additional arguments why the denial is arbitrary and capricious and not in accordance with the law – (1) Defendants failed to acknowledge or explain their supposed change in position between the asylum grant in 2001 and the inadmissibility denial in 2019 on the same facts and (2) there is a contradiction between the determination that he is inadmissible and his continuing asylum status.  *See* Pl. SJ Br. at 22-26.  These arguments are unavailing.  As an

initial matter, plaintiff's effort to characterize USCIS's 2019 decision as representing a "change in position" from the 2001 asylum grant is a mischaracterization and overlooks the fact that the decisions were made by different decision-makers applying different law.  Specifically, the IJ granted plaintiff's asylum in May 2001 prior to the changes in the INA's terrorism-related activity bar that were enacted post-September 11, 2001 through the PATRIOT Act.  USCIS denied plaintiff's I-485 application under the INA version in effect eighteen years later.

For the same reasons stated above, Plaintiff's argument that the supposed change in position between the asylum grant in 2001 and the inadmissibility denial in 2019 on the same facts is arbitrary and capricious, Pl. SJ Br. at 23-24, ignores the change in laws during that time.  In *Hosseini*, the petitioner argued that USCIS acted in an arbitrary and capricious manner because of two conflicting decisions on his admissibility to the United States – his asylum grant in 1999 and the denial of his application to adjust legal status 15 years later due to his provision of material support to terrorist organizations.  *Hosseini*, 911 F.3d at 377.  *Hosseini* rejected that argument as "unavailing," discussing the changes the PATRIOT Act made to the terrorism-related grounds for inadmissibility.  *Id.* at 378.  "Thus, when USCIS denied Hosseini's application in 2014, it relied on law that had changed since it granted Hosseini's asylum request in 1999."  *Id.*  Ultimately, because USCIS had provided a "well-reasoned explanation for its decisions, . . . it did not act in an arbitrary or capricious manner when it ultimately rejected Hosseini's application because of his inadmissibility."  *Id.*  Like in *Hosseini*, this Court should also reject plaintiff's argument that the denial is arbitrary and capricious given the change in law.

Plaintiff's argument that there is a contradiction between the determination that he is inadmissible and his continuing asylum status, Pl. SJ Br. at 24-26, ignores the interplay between the statutes and the fact that individuals are able to be asylees while also being inadmissible to the

United States.  In the case of an asylum application, a grant does not "create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."  8 U.S.C. § 1158(d)(7).  An asylum grant provides an alien with a basis to apply for adjustment of status after being present in the United States after one year.  *See Immigration & Naturalization Serv. v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999) (citation omitted).  In order for an asylee to adjust his or her immigration status, the asylee must be admissible "at the time of examination for adjustment of such alien."  8 U.S.C. § 1159(b)(5).  Aliens described as inadmissible under 8 U.S.C. § 1182(a), including under the terrorism-related inadmissibility grounds at 8 U.S.C. § 1182(a)(3)(B), are not eligible to adjust status.  8 U.S.C. § 1159(b), (c).  While the statute provides for waiver in certain circumstances, USCIS cannot waive terrorism-related inadmissibility grounds when adjudicating an application to adjust status.  *See* 8 U.S.C. § 1159(c).  Courts have also concluded that USCIS's inadmissibility determination is not arbitrary and capricious despite the fact that the petitioner was previously granted asylum.  *Kakar*, 2020 WL 1545422, at *10-*12.

Therefore, for all the reasons above, USCIS's denial of plaintiff's adjustment of status application based on his having provided material support to a Tier III terrorist organization "was not arbitrary and capricious, was supported by substantial evidence, and showed a 'rational connection between the facts found and the choice made.'"  *Kakar*, 2020 WL 1545422, at *6 (citing *Karpova*, 497 F.3d at 268).[14]  The Court should therefore grant summary judgment in favor of the government.

---

[14] Plaintiff alleges that the government also concluded that Mr. Azatullah was "inadmissible" because he was a member of the mujahidin.  *See* Pl. SJ Br. at 35 n.13 (citing AR 04, 05).  However, that allegation is incorrect.  While the Denial Letter states that Azatullah is a member of the mujahidin, USCIS's conclusion was grounded in his provision of material support to the mujahidin.  AR 05.  The Denial Letter did not mention membership as part of its analysis of the Limited General Exemption.  AR 06.  If the Denial Letter was based on the finding that he was a

**B.  USCIS Considered the Full Record and Concluded That Plaintiff Is Not Eligible For the Exemption.**

As the Denial Letter explained, USCIS determined that Azatullah was not eligible for the exemption for two additional reasons beyond his provision of material support to a Tier III terrorist organization: namely, (1) he was "inadmissible pursuant to [§ 1182](a)(3)(B)(iv)(VI)(aa) for providing material support for the commission of a terrorist activity (aiding in the placement of mines and guiding the Mujahedeen around the city when they were planning operations)," and (2) "also appear[s] to be inadmissible pursuant to [§ 1182](a)(3)(B)(iv)(II) for preparing or planning a terrorist activity."  AR 07.  These grounds are not covered by the Limited General Exemption.

Plaintiff alleges that he does not fall within the inadmissibility category in § 1182(a)(3)(B)(iv)(VI)(aa) because the reasoning for placing him in that category – aiding in the placement of <u>mines</u> and guiding the mujahidin when they were planning <u>operations</u> – is based on an "error" in the record and a vague word chosen by an interpreter.  Pl. SJ Br. at 26-31.  However, the decision was supported by substantial evidence in the record and there was a rational connection between the facts found and the choice made.  In his 1991 sworn statement, Azatullah stated:  "We also assisted the mujahidin by giving them money and supplies, [and] guiding them around the city of Kabul to help them with the strategic placement of mines in non-civilian areas."  AR 25 at ¶ 9.  While Azatullah attempted to disavow that sworn statement by stating that "we" only meant his father and brother, not him, AR 731-733,[15] USCIS did not find the disavowal

---

member of a terrorist organization, it would have cited the relevant provision, 8 U.S.C. § 1182(a)(3)(B)(i)(VI).

[15] During the interview, the USCIS officer focused on the content of the original sworn statement.  *See* AR 731 at 53:4:20, 24-25 (statement by USCIS Officer that "I'm referring to your sworn statement," "That's what stated in your sworn statement."); AR 733 at 55:4-7 (statement by USCIS Officer, "But specifically with the strategic placement of mines that's what the statement – it's not really argument, I'm just telling you.").

credible based in part on the fact that the sworn statement was filed with immigration court, and that Azatullah did not advise that the affidavit was incorrect until his adjustment of status interview.  AR 07.

*Kakar* is on point to the credibility determination.  The petitioner in that case originally stated in a sworn affidavit that he used a gun, and only denied that statement later when he was given an opportunity to submit evidence as to why he was not inadmissible.  *Kakar*, 2020 WL 1545422, at *3.  USCIS noted the "timing of Mr. Kakar's newly minted denial," and that fact that it conflicted with past statements and "was not credible."  *Id.* at *7.  Ultimately the court concluded that USCIS's evaluation of petitioner's earlier statements regarding his use of the firearm was "objectively reasonable.  USCIS's denial of adjustment of status was supported by the record, and explained its adverse credibility assessment of plaintiff's [later] statement regarding firing the gun at nobody.  Thus, USCIS's decision regarding the Weapons Bar is not arbitrary or capricious and was supported by substantial evidence."  *Id.* at *8.  Like in *Kakar*, USCIS's decision regarding Azatullah's inadmissibility was supported by statements in the record and USCIS explained its "adverse credibility" assessment of plaintiff's later statement.

Plaintiff's cited case *Qubadi v. Hackbarth*, No 17 Civ. 06286 (TJH) (MRWx), 2019 WL 6139110, at *3 (C.D. Cal. Aug. 27, 2019), is distinguishable.  The evidence that petitioner "used" a firearm in *Qubadi* was a note from an USCIS officer that was allegedly recorded contemporaneously with the asylum interview as well as photographs of petitioner holding weapons.  *Id.*  The Court concluded that the "Government's findings that Qubadi was engaged in terrorist activities were not based on substantial evidence," and "they were, therefore, arbitrary or capricious."  *Id.*  Here, in contrast, there was a sworn affidavit provided as part of the asylum application that specifically mentioned Azatullah's guiding the mujahidin around the city to help

"with the strategic placement of mines in non-civilian areas."  AR 25 at ¶ 9.  In addition, during

his August 1992 hearing, Azatullah stated that when the mujahidin were "going to do operation,"

they asked him "where is this place?  I have to go with them and show them that place."  AR 42,

399.  Azatullah also stated that he transported and hid mujahidin weapons in his house.  AR 12-

13, 752.  In addition to Azatullah's statement about the mines, USCIS relied on the information

regarding the weapons and operations in determining that Azatullah assisted in carrying out

terrorist activities.  *See* AR 07 ("USCIS further finds that your testimony at the asylum hearing

regarding guiding the Mujahedeen around the city when they were planning operations, and your

testimony at the adjustment of status interview regarding hiding weapons, to be unambiguous and

to establish that you were assisting them to carry out terrorist activities.").  Therefore, unlike in

*Qubadi*, USCIS's decision in this case was supported by substantial evidence provided by plaintiff.

Even considering the inconsistent record evidence regarding Azatullah's allegedly guiding

the mujahidin to help them with the placement of mines, it was not error to rely on Azatullah's

earlier representations.  *See Alaswad v. Johnson*, 574 F. App'x 483, 486 (5th Cir. 2014) (holding

BIA did not err by relying on appellants' "previous representations" despite arguably contradictory

record evidence including retractions of earlier statements).  *Alaswad* noted there was "substantial

evidence in the record" supporting its decision.  *Id.* at 486.  Here, too, the prior sworn statements

and testimony during the 1992 and 2019 interviews support USCIS's decision.

USCIS's statement that Azatullah "appear[s] to be inadmissible pursuant to

[§ 1182](a)(3)(B)(iv)(II)] for preparing or planning a terrorist activity," AR 07, is also supported

by the evidence in the record – namely, the statement that he guided the mujahidin when they were

"going to do operation" and the statement that he guided the mujahidin around the city to help

"with the strategic placement of mines in non-civilian areas."  AR 25 at ¶ 9, AR 399 at 97:17-20.

Therefore, under deferential APA review, this Court should uphold the agency's denial of the exemption because USCIS's "decision offers a factually-supported and well-reasoned basis for its determination" that Azatullah is inadmissible, which included a "rational connection between the facts found and the choice made." *Kakar*, 2020 WL 1545422, at *9.

## IV.   Plaintiffs' CARRP Claim Is Based on Conclusory Allegations and Should Also Be Rejected Because USCIS Provided a Satisfactory Explanation for Its Action

Plaintiff's CARPP claim is premised on his conclusory assertion "[o]n information and belief" that his decision was subjected to CARRP and "ultimately denied for reasons that were entirely pretextual." Compl. ¶ 85.  Courts across the country have dismissed CARRP counts with similar conclusory allegations.  In *Al-Saadoon v. Baar*, the petitioners' pleadings, "'on their face, have not provided anything to support their claim that' USCIS denied their applications because of CARRP, 'other than labels and conclusions, based on speculation.'"  973 F.3d 794, 804 (8th Cir. 2020).  The Court dismissed the CARRP claim because petitioners "failed to allege sufficient facts to establish that CARRP caused the denial of their applications." *Id.*  In *Orwa A. v. Whitaker*, petitioners "describe CARRP only very generally, and then allege: '[u]pon information and belief, CARRP is the only reason [F.H.] and [O.A.]'s multiple petitions have languished at USCIS for well over a decade and suffered multiple denials over this time period,'" No. 18 Civ. 2043 (ECT) (KMM), 2018 WL 6492353, at *10 (D. Minn. Dec. 10, 2018), *aff'd sub nom. Al-Saadoon v. Barr*, 973 F.3d 794 (8th Cir. 2020).  *Orwa* dismissed the count, noting that petitioners do not "plead sufficient facts about the alleged application of CARRP to the particular applications and requests at issue in this case to cross the threshold from what is possible to what is plausible." *Id.*

Here, the Complaint has similar conclusory statements.  Compl. ¶ 85 ("On information and belief, in accordance with CARRP procedures, Plaintiff's application was unreasonably delayed and ultimately denied for reasons that were entirely pretextual. The unreasonable delay and

pretextual denial of Plaintiff's application for adjustment of status under CARRP were arbitrary, capricious and not in accordance with law.").  And like in *Al-Saadoon* and *Orwa*, this Court should conclude that plaintiff failed to allege sufficient facts that CARRP resulted in the denial.

Plaintiff alleges that a never-sent draft Notice of Intent to Deny, AR 659-61, shows that CARRP's mandate applied in this case.  Pl. SJ Br. at 39 (the document "shows that USCIS has for years been blindly focused on CARRP's mandate to find some reason, *any* reason, to deny the application and if it cannot be denied, then it must be delayed.").  However, as plaintiff acknowledges, Pl. SJ Br. at 38, the draft Notice of Intent to Deny was never sent, and did not form any part of the Denial Letter in 2019.  *See generally* AR 01-08.  Plaintiff also argues that the "adverse effect of the application of CARRP procedures" to plaintiff is "readily apparent" by arguing that the Denial Letter "strains the record to find a barely articulable pretext for denial in the phrasing of an old affidavit and 28-year old facts."  Pl. SJ Br. at 37.  As discussed above, USCIS's denial "was not arbitrary and capricious, was supported by substantial evidence, and showed a 'rational connection between the facts found and the choice made.'"  *Kakar*, 2020 WL 1545422, at *6; Section III.B.  Therefore, to the extent that plaintiff's CARRP count rests on the same reasoning as his count that the denial is arbitrary and capricious, the court should reject it for the reasons set forth in Section III.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny plaintiff's motion for summary judgment, grant its cross-motion for summary judgment, and dismiss plaintiff's claims.

Dated:    New York, New York
          December 7, 2020

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York,
Attorney for Defendants

By:   /s/ *Rebecca R. Friedman*
REBECCA R. FRIEDMAN
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel.    (212) 637-2614
Fax    (212) 637-2686
rebecca.friedman@usdoj.gov

41